1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11   MADISON FISK, RAQUEL CASTRO, GRETA VISS, CLARE BOTTERILL, MAYA BROSCH, HELEN BAUER, CARINA CLARK, NATALIE FIGUEROA, ERICA GROTEGEER, KAITLIN HERI, OLIVIA PETRINE, AISHA WATT, KAMRYN WHITWORTH, SARA ABSTEN, ELEANOR DAVIES, ALEXA DIETZ, and LARISA SULCS, individually and on behalf of all those similarly situated, | Case No.:  22-CV-173 TWR (MSB)  **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS I AND III OF PLAINTIFFS' SECOND AMENDED COMPLAINT**  (ECF No. 42) |

                                                    Plaintiffs,

v.

BOARD OF TRUSTEES OF THE
CALIFORNIA STATE UNIVERSITY
and SAN DIEGO STATE UNIVERSITY,

                                                    Defendants.

26        Presently before the Court is the Motion to Dismiss Counts I and III of Plaintiffs'

27   Second Amended Complaint (ECF No. 42, "Mot.") filed by Defendants the Board of

28   Trustees of the California State University and San Diego State University (collectively,

"SDSU"),[1] along with Plaintiffs' Opposition to (ECF No. 45, "Opp'n") and Defendants' Reply in Support of (ECF No. 46, "Reply") the Motion.  The Court held a hearing on March 2, 2023.  (*See* ECF No. 47.)  Having carefully considered the Parties' arguments, the Second Amended Complaint (ECF No. 41, "SAC"), and the relevant law, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss.

**BACKGROUND**

## I.     Factual Background[2]

Plaintiffs, "past and current female varsity student-athletes at SDSU," initiated this lawsuit against Defendants on February 7, 2022, alleging Defendants, who receive federal funding, have engaged in intentional discrimination based on sex in its athletics programs in violation in Title IX.  (SAC ¶¶ 1, 17, 187–88, 223); *see also* 20 U.S.C. §§ 1681, 1687.  Plaintiffs specifically claim SDSU has violated Title IX and its guiding regulations by "depriving its female varsity student-athletes of equal athletic financial aid, denying them equal athletic benefits and treatment, and retaliating against them because some of them sued SDSU for violating Title IX."  (SAC ¶ 1.)

### A.     *Disproportionate Financial Aid*

There are seventeen named Plaintiffs in this action, and they seek to represent a class of current and former SDSU female student-athletes whom they allege have been harmed by SDSU's discrimination against female student-athletes.  (SAC ¶¶ 46–180, 335–36.)  The named Plaintiff, the sport each plays or played, and the total amount of athletic financial aid each received is listed below.

/ / /

/ / /

---

[1]     Throughout this Order, pin citations refer to the CM/ECF pagination stamped at the top of each page.

[2]     For purposes of Defendants' Motion, the facts alleged in Plaintiffs' Second Amended Complaint are accepted as true.  *See Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007).

2

| | Plaintiff[3] | Sport[4]/Current Year in School[5] | Total Aid Received (Specific Years) |
|---|---|---|---|
| 1 | Madison Fisk* | Rowing/Grad. May '22 | $28,200 |
| 2 | Raquel Castro | Rowing/Sr. | $3,200 |
| 3 | Greta Viss | Rowing/Grad. Yr. unknown | $24,000 (Fr. & Soph.) |
| 4 | Clare Botterill | Rowing/Sr. | $38,000 (Jr.) |
| 5 | Maya Brosch[+] | T&F/Grad. '21 | $19,640 |
| 6 | Olivia Petrine | Rowing/Jr. | $800 (while athlete) + $800 (after rowing team was eliminated) |
| 7 | Helen Bauer* | Rowing/Grad. May '22 | $30,000 (Fr. & Soph.) |
| 8 | Carina Clark*^ | T&F/Grad. May '22 | $800 (Sr.) |
| 9 | Natalie Figueroa | Rowing/Sr. | $0 |
| 10 | Erica Grotegeer^ | T&F/Sr. | $37,879 |
| 11 | Kaitlin Heri*^ | T&F/Grad. May '22 | $64,600 |
| 12 | Aisha Watt^ | T&F/Sr. | $14,200 + Will receive $9,600 for second semester of 2022-2023 school year |
| 13 | Kamryn Whitworth[+] | Rowing/Grad. '21 | $13,200 |
| 14 | Sara Absten*^ | T&F/Grad. May '22 | "Partial" / "Fluctuated" |
| 15 | Eleanor Davies[+] | Rowing/Soph. (Transferred Jan '22) | $22,500 |
| 16 | Alexa Dietz* | Rowing/Grad. May '22 | $18,400 |
| 17 | Larisa Sulcs | Rowing/Sr. | $22,800 (Fr. & Soph.) |

/ / /

---

[3]      "*" indicates Plaintiff was a current varsity student-athlete on the date this lawsuit was initially filed on February 7, 2022, but has since graduated. (SAC ¶¶ 46, 87, 94, 123, 152, 169.)  "+" indicates Plaintiff was no longer a student at SDSU when the Complaint was filed. (*Id.* ¶¶ 74, 145, 163.)  "^" indicates Plaintiff was present at the Zoom meeting at which SDSU allegedly retaliated. (*Id.* ¶¶ 101, 119, 130, 141, 159.)

[4]      SDSU eliminated its women's varsity rowing team in Spring 2021. (SAC ¶ 164.)  But "[w]hen SDSU announced the elimination of the women's rowing team, it pledged to honor the scholarships for all members of the team *through* their graduation date if those members of the former team remained at SDSU." (*Id.* ¶ 247.)

[5]      The school year listed is as of November 29, 2022—the date the Second Amended Complaint was filed. (*See generally* SAC.)

(*Id.* ¶¶ 46–47, 49, 53–54, 56, 60–61, 63, 67–68, 70, 74–76, 80–81, 83, 87–88, 90, 94–95, 97, 105–06, 108, 112–13, 115, 123–24, 126, 134–35, 137, 145–46, 148, 152–53, 155, 163–65, 169–71, 175–77.)

As relevant to the instant Motion, Plaintiffs allege that they "were and are eligible for athletic financial aid up to and including a full scholarship, a cost-of-living stipend, summer aid, fifth-year aid, and NCAA Special Assistance Funds if appropriate." (*Id.* ¶ 18.) But "SDSU has not paid its female varsity student-athletes equal athletic financial aid for over a decade," even though SDSU can provide athletic financial aid at any point during an academic year and is thus able to correct any discriminatory allocation at any point. (*Id.* ¶¶ 2, 238–39.) The cost of attendance at SDSU varies for in-state and out-of-state residents: between 2018 and 2022, the in-state cost was $28,142 per year and the out-of-state cost was $39,230 per year. (*Id.* ¶¶ 19–20.)

In terms of scholarships, the NCAA "does not impose a limit on the dollar amount of aid that can be offered for any sport. Instead, the NCAA limits the number of scholarships that may be awarded for each sport." (*Id.* ¶ 21.) "[H]ead-count sports must award full athletic scholarships on a per-athlete basis," whereas "equivalency sports may split up to a full athletic scholarship among many athletes." (*Id.* ¶ 22.) For example, before SDSU eliminated its women's rowing team, that team was permitted to have the equivalent of twenty athletic scholarships awarded to the female rowers—the women's rowing coach was typically given a total dollar amount of athletic financial aid equivalent to fifteen in-state scholarships and five out-of-state scholarships.[6] (*Id.* ¶¶ 25–26.) Some female rowers received partial athletic scholarships, and some received full athletic scholarships under the dollar cap imposed by SDSU. (*Id.* ¶ 27.) But "[n]one of the Plaintiffs received all the athletic financial aid for which she was eligible." (*Id.* ¶ 30.) And each Plaintiff who is a

---

[6] These same dollar caps were not imposed, for example, on male student-athletes on the football team. (SAC ¶ 28.) Aid to those athletes was only capped by the NCAA's limit of eighty-five scholarships to the football team, in the full amount of out-of-state cost of attendance. (*Id.*)

current student-athlete "has athletic eligibility remaining and intends to continue to participate as a varsity student-athlete until she has graduated and/or exhausted her eligibility to participate in intercollegiate varsity sports." (*Id.* ¶ 41.)

Plaintiffs summarize SDSU's grant of athletic aid among male and female student-athletes over the last decade[7] via data "verified as accurate by SDSU to the federal government pursuant to the Equity in Athletics Disclosure Act (EADA),"[8] (SAC ¶ 228), as follows:

| Year | Total # of Female Student Athletes | Total # of Male Student Athletes | % of Females | Female Aid Awarded | Male Aid Awarded | % of Aid Awarded to Females | Amount of Aid SDSU Deprived Female Students Athletes |
|------|------|------|------|------|------|------|------|
| 2010 | 269 | 222 | 54.79% | $2,776,419.00 | $2,708,301.00 | 50.62% | $228,447.97 |
| 2011 | 302 | 235 | 56.24% | $3,169,134.00 | $3,073,774.00 | 50.76% | $341,775.15 |
| 2012 | 312 | 231 | 57.46% | $3,586,299.00 | $3,181,040.00 | 52.99% | $302,116.78 |
| 2013 | 322 | 239 | 57.40% | $3,813,759.00 | $3,482,941.00 | 52.27% | $374,364.71 |
| 2014 | 310 | 236 | 56.78% | $3,943,771.00 | $3,685,045.00 | 51.70% | $387,608.05 |
| 2015 | 304 | 230 | 56.93% | $4,176,824.00 | $3,914,582.00 | 51.62% | $429,519.49 |
| 2016 | 315 | 226 | 58.23% | $4,426,056.00 | $4,155,385.00 | 51.58% | $570,531.64 |
| 2017 | 303 | 216 | 58.38% | $4,527,853.00 | $4,325,925.00 | 51.14% | $641,115.66 |
| 2018 | 316 | 221 | 58.85% | $4,580,663.00 | $4,604,510.00 | 49.87% | $824,392.25 |

---

[7]    The Parties disagree about the effect the statute of limitations has on Plaintiffs' financial aid claim, (*see* ECF No. 42-1 ("Mem.") at 17 n.6; Opp'n at 20 n.11), but the Court has already reserved judgment on this issue, (*see* ECF No. 38 at 11).

[8]    While EADA data and Title IX data are not identical, courts have relied on EADA data at the early stages of Title IX litigation, particularly because the schools and not the plaintiffs are the only parties who have access to the underlying Title IX data. *See Balow v. Mich. State Univ.*, 24 F.4th 1051, 1059–60 (6th Cir. 2022); *Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085, 1101 (S.D. Iowa 2020) (collecting cases and noting "[d]efendants' argument that EADA reports cannot be relied on carries no force, considering that other courts have specifically relied on such records at the early stages of Title IX litigation"); *see also Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 968 (9th Cir. 2010) (stating in the context of allegations that the university did not provide equal provision of athletic opportunity that "EADA reports contain ample data demonstrating that [the university] could not satisfy the substantial proportionality option and that the trend of increasing female athletic participation reversed after" a certain period).

| 2019 | 315 | -- | 58.12% | -- | -- | 50.57% | $694,267.88 |
| 2020[9] | 305 | -- | 57.22% | -- | -- | 50.64% | $571,692.82 |

(*Id.* ¶¶ 228–333.)

Plaintiffs allege that between 2018 and 2020, SDSU female student-athletes received over $1.2 million less in athletic financial aid, and the male student-athletes received over $1.2 million more, than they would have "if SDSU had granted aid in proportion to the number of students of each sex participating in intercollegiate athletics." (*Id.* ¶ 234.)

## B.    *Retaliatory Conduct*

On February 16, 2022, nine days after Plaintiffs filed this lawsuit, SDSU's women's track and field team held a recorded Zoom meeting.[10]  (SAC ¶ 298.)  Five of the named Plaintiffs were present, along with most of the other members of the track and field team. (*Id.* ¶ 299.)

At the meeting, before discussing their upcoming competition, SDSU "told all of the team members that it was disappointed and unhappy with the five women on the team who had brought the Title IX lawsuit against the school." (*Id.* ¶ 300.)  Head coach Sheila Burrell, an SDSU employee, specifically stated she was disappointed with those five members of the team because they were involved with the lawsuit and "were putting their individual interests above the team's." (*Id.* ¶¶ 301–03.)  Burrell also called the Title IX lawsuit a distraction and stated that "being a member of the varsity women's track and [field] teams is not a right, suggesting to some of the women that those who participated in or assisted with the lawsuit could be removed from the team." (*Id.* ¶¶ 304–05.)

---

[9]     EADA data is not yet available for the 2021–2022 academic year, and the 2022–2023 academic year is ongoing.  (SAC ¶ 234 n.5.)  But Plaintiffs allege that a similarly disproportionate allocation of athletic financial aid occurred in the 2021–2022 school year, is taking place in the current academic year, and will continue in the future.  (*Id.* ¶ 235.)

[10]     "SDSU's women's varsity track and field student-athletes are members of three different teams: the indoor track & field team, the outdoor track & field team, and the cross[-]country team." (SAC ¶ 95 n.1.)  For simplicity's sake, the Court refers to the relevant Plaintiffs as members of SDSU's track and field team.

Plaintiffs allege SDSU implicitly threatened those who participated or assisted in the lawsuit with removal from the team. (*Id.* ¶ 306.) In singling out the five Plaintiffs on the Zoom call, SDSU subjected them to "embarrassment, humiliation, and anxiety solely because they had filed a Title IX lawsuit against SDSU." (*Id.* ¶ 310.) And "[b]ecause of SDSU's comments, other women's track and field team members were immediately wary and are wary of pursuing Title IX claims against SDSU, including by joining as named Plaintiffs or otherwise participating or assisting in this case." (*Id.* ¶ 318.) In fact, "shortly after the Zoom meeting, several members of the women's track and field team told Plaintiffs that they had been considering joining the lawsuit but were glad they had not done so and would not do so now as a result of SDSU's comments through Coach Burrell to the team." (*Id.* ¶ 319.)

Plaintiffs also allege that when SDSU (through Coach Burrell) made the threatening comments on the Zoom call, SDSU knew: (1) Plaintiffs were preparing to file an amended complaint adding a claim for unequal treatment and benefits for current female student-athletes; (2) only current varsity student-athletes would raise such a claim; (3) since the five track and field Plaintiffs were already suing the school for deprivation of equal financial aid, they would likely participate in the unequal treatment claim; (4) the women's track and field team was the "most obvious source" for additional plaintiffs; and (5) if SDSU "directly and openly retaliated" against the five Plaintiffs, it would have a "chilling effect" on the rest of the team and other female student-athletes would be deterred from pursuing their Title IX rights. (*Id.* ¶¶ 312–16.)

In addition, Plaintiffs contend that SDSU's refusal to take action to ameliorate or minimize the harm done by its allegedly retaliatory comments made the situation worse. (*Id.* ¶ 321.) On February 28, 2022, Plaintiffs requested a copy of the Zoom meeting recording and for SDSU to make a statement to "mitigate the damage done by its comments." (*Id.* ¶¶ 322–23.) Plaintiffs also inquired as to what actions SDSU would take to ensure no SDSU employee would retaliate against Plaintiffs or deter women from exercising their Title IX rights. (*Id.* ¶ 324.) SDSU responded that there was "no evidence

of retaliatory actions or intent" and that it would "address the situation internally," declining to "provide any details about how it would address the comments." (*Id.* ¶¶ 327–30.) SDSU also declined to provide the recording of the Zoom meeting. (*Id.* ¶ 330.)

## II.    Procedural History

After Plaintiffs filed their initial Complaint, (ECF No. 1), Defendants filed a Motion to Dismiss Plaintiff's Complaint, (ECF No. 22). Plaintiffs then filed a First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B). (ECF No. 24.)

Defendants again filed a Motion to Dismiss. (ECF No. 30.) The Court granted in part and denied in part Defendants' Motion. (*See* ECF No. 38.) Specifically, the Court found: (1) Plaintiffs had failed to sufficiently allege standing to bring their disproportionate financial aid claim, (*id.* at 12–14); (2) Plaintiffs had sufficiently stated a claim for unequal benefits and treatment under Title IX, (*id.* at 14–17); (3) Plaintiffs who had not attended the Zoom meeting lacked standing to pursue a retaliation claim, (*id.* at 18–19); and (4) Plaintiffs who attended the Zoom meeting had failed to state a retaliation claim, (*id.* at 19–20). The Court granted Plaintiffs leave to file an amended complaint. (*Id.* at 21.)

Plaintiffs then filed a timely Second Amended Complaint, (*see* SAC), alleging the following violations of Title IX: (1) SDSU failed to provide proportional athletic financial aid to female student-athletes, (2) SDSU failed to provide equal treatment and benefits to female student-athletes, and (3) SDSU retaliated against Plaintiffs for filing this lawsuit. (*Id.* ¶¶ 222–334, 353–78.) Plaintiffs seek class certification as well as declaratory, injunctive, and monetary relief.[11] (*Id.* Prayer for Relief.) Defendants now move to dismiss Counts I and III of Plaintiffs' Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (*See generally* Mot.)

---

[11]    With regards to Plaintiffs' Title IX financial aid claim, Plaintiffs seek "compensatory damages and other monetary relief as permitted by law." (SAC Prayer for Relief ¶ G.) As for their retaliation claim, Plaintiffs seek "nominal, compensatory, as appropriate, and other monetary relief permitted by law." (*Id.* Prayer for Relief ¶ H.)

# LEGAL STANDARDS

## I.   Federal Rule of Civil Procedure 12(b)(1)

A party may challenge the Court's subject-matter jurisdiction through a motion filed pursuant to Federal Rule of Civil Procedure 12(b)(1).  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  Because "[f]ederal courts are courts of limited jurisdiction," "[i]t is to be presumed that a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Consequently, "the burden of establishing the contrary rests upon the party asserting jurisdiction."  *Id.*

"Because standing . . . pertain[s] to a federal court's subject-matter jurisdiction under Article III, [it is] properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1)."  *White*, 227 F.3d at 1242 (citing *Bland v. Fessler*, 88 F.3d 729, 732 n.4 (9th Cir. 1996)).  In fact, "[s]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III."  *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1035 (9th Cir. 2008) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)).

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) [he or she] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).  "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  And where "a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element."  *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.'"  *Id*. at 338 n.6 (quoting *Simon v.*

*E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976)); *see also Warth*, 422 U.S. at 501 ("[P]laintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.").

## II. Federal Rule of Civil Procedure 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Id.* at 1242 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

1    "If a complaint is dismissed for failure to state a claim, leave to amend should be
2    granted 'unless the court determines that the allegation of other facts consistent with the
3    challenged pleading could not possibly cure the deficiency.'"  *DeSoto v. Yellow Freight*
4    *Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well*
5    *Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).  "A district court does not err in
6    denying leave to amend where the amendment would be futile." *Id.*

### ANALYSIS

8        As is relevant to the instant Motion, Plaintiffs allege that Defendants, in violation of
9    Title IX, failed to provide proportional athletic financial aid to female student-athletes
10   (Claim I) and retaliated against Plaintiffs for filing this lawsuit (Claim III).  (SAC ¶¶ 298–
11   306, 318, 357–61, 370–78.)  Pursuant to Title IX, "[n]o person in the United States shall,
12   on the basis of sex, be excluded from participation in, be denied the benefits of, or be
13   subjected to discrimination under any education program or activity receiving Federal
14   financial assistance." 20 U.S.C § 1681.  And under the guiding regulation relevant to this
15   case, "[n]o person shall, on the basis of sex, be excluded from participation in, be denied
16   the benefits of, be treated differently from another person or otherwise be discriminated
17   against in any interscholastic, intercollegiate, club or intramural athletics offered by a
18   recipient, and no recipient shall provide any such athletics separately on such basis." 34
19   C.F.R. § 106.41(a).  The U.S. Department of Education's Office for Civil Rights ("OCR")
20   has adopted additional regulations to ensure schools, like SDSU, "provide equal athletic
21   opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

22       In response to complaints alleging Title IX discrimination in athletics, the OCR
23   issued a Policy Interpretation of Title IX and its own regulations in 1979, titled "Title IX
24   and Intercollegiate Athletics."[12]  (*See generally* ECF No. 30-4.)  The goal of the Policy

---

[12]   The Court previously found Plaintiffs' First Amended Complaint incorporated by reference the
1979 Policy Interpretation, (*see* ECF 30-4), along with a 1998 Dear Colleague Letter, (*see* ECF No. 30-
5).  (*See* ECF No. 38 at 10–11.)  In the Second Amended Complaint, Plaintiffs also extensively reference
these documents.  (*See, e.g.*, SAC ¶¶ 191, 195–96, 198–99.)  The Court once again finds these two

11

Interpretation was to "provide further guidance on what constitutes compliance with the law." (*Id.* at 3.)  For example, the Policy Interpretation clarifies institutions' obligations to "provide equal opportunities in athletic programs" and how to assess compliance.  (*Id.* at 5.)  In addition, the "Ninth Circuit has held that the regulations set forth by the [Department of Education ("DOE")] with respect to Title IX are entitled to 'controlling weight' and that 'federal courts are to defer substantially' to the DOE's interpretation of those regulations." *Anders v. Cal. State Univ., Fresno*, No. 1:21-cv-00179-AWI-BAM, 2021 WL 3115867, at *4 (E.D. Cal. July 22, 2021) (citing *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 770–71 (9th Cir. 1999)).

Citing these regulations and the Policy Interpretation, Defendants seek to dismiss Plaintiffs' disproportionate financial aid claim and retaliation claim on the grounds that: (1) Plaintiffs fail to allege standing to bring either claim; and (2) even if they had standing, Plaintiffs fail to state plausible claims.  (*See* Mot. at 2; Mem. at 12–28.)

## I.    Claim I: Disproportional Financial Aid

Title IX regulations state that institutions that award athletic scholarships or grants-in-aid "must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics." 34 C.F.R. § 106.37(c); *see also* 45 C.F.R. 86.37(c).  Section VII.A. of the Policy Interpretation instructs that compliance with this requirement will be examined by "a financial comparison to determine whether proportionately equal amounts of financial assistance (scholarship aid) are available to men's and women's athletic programs." (ECF No. 30-4 at 5.)  The comparison is measured by "dividing the amounts of aid available for the members of each sex by the numbers of male or female participants in the athletic program and comparing the results." (*Id.* at 5–6.)  A university complies
/ / /

---

documents incorporated by reference and thus assumes the truth of their contents. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002–03 (9th Cir. 2018).

with Title IX if the comparison shows "substantially equal amounts" or if the disparity can be explained by "legitimate, nondiscriminatory factors." (*Id.* at 6.)

> If any unexplained disparity in the scholarship budget for athletes of either gender is 1% or less for the entire budget for athletic scholarships, there will be a strong presumption that such a disparity is reasonable and based on legitimate and nondiscriminatory factors. Conversely, there will be a strong presumption that an unexplained disparity of more than 1% is in violation of the "substantially proportionate" requirement.

(ECF No. 30-5 at 5 (U.S. DOE, *Dear Colleague Letter* (July 23, 1998).)

Plaintiffs allege that over the past decade, Defendants have not provided "athletic aid in proportion to the numbers of students of each sex participating in intercollegiate athletics" in violation of Title IX. (SAC ¶ 357.) Defendants move to dismiss Plaintiffs' disproportionate financial aid claim contending that the named Plaintiffs do not have standing to bring this claim and, even if they did, they have failed to state a plausible claim. (Mot. at 2.)

### A. Standing

The Court previously held that Plaintiffs had failed to allege standing to bring a Title IX financial aid claim because they failed to specify how the alleged financial disparity "specifically affected each of them—i.e., that she would have received a larger scholarship if the budget had been proportional." (ECF No. 38 at 13.) Defendants contend that Plaintiffs have again failed to allege any concrete and particularized injuries-in-fact that they suffered because of any disproportionate grants of financial aid. (Mem. at 13.) Plaintiffs counter that they have now alleged three ways in which the disparity in financial aid personally injured them: (1) they were denied the opportunity to compete for aid on equal footing with male athletes; (2) they were given smaller financial awards; and (3) they endured the psychological and stigmatic harms of being treated like second-class citizens.

/ / /

/ / /

/ / /

(Opp'n at 8–20.)[13]  Set forth below is an analysis of whether Plaintiffs have sufficiently alleged standing with respect to those claimed injuries-in-fact and whether those injuries are redressable by a favorable court decision as to each type of relief sought (damages and injunctive/declaratory relief).

> 1.   *Alleged Injury 1: Denied Opportunity to Compete on Equal Footing*
>> a.   Injury-in-Fact

Plaintiffs argue that they suffered an injury-in-fact because they were denied "the *opportunity* to compete for aid on an equal basis" and that "[i]t is this equal opportunity, and not a 'right to a scholarship,' that Title IX protects."  (Opp'n at 8–9 (citing 34 C.F.R. § 106.37(c) and highlighting that the law requires institutions that provide athletic scholarships to provide reasonable *opportunities* for scholarship awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics).)  Plaintiffs did not allege this type of injury-in-fact in their prior Complaint, and the Court has yet to address this argument.  In fact, it appears no other court has addressed this argument in the Title IX financial aid context.

Analogizing to cases in the equal-protection context, Plaintiffs argue that to establish standing, "a plaintiff need only demonstrate that she is 'able and ready' to compete for the benefit 'and that a discriminatory policy prevents [her] from doing so on an equal basis.'"  (*Id.* (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of*

---

[13]   Despite extensive briefing on the issue of standing, neither Party addresses a critical component of the standing analysis—"a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc.*, 528 U.S. at 185; *see Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (citation omitted)); *City of Los Angeles v. Lyons*, 461 U.S. 95, 109–10 (1983) (notwithstanding the fact that the plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief).  "The same principle applies when there are multiple plaintiffs.  At least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester*, 581 U.S. at 439.  With regards to declaratory and injunctive relief, "it is insufficient for [a plaintiff] to demonstrate that he was injured in the past; he must instead show a very significant possibility of future harm in order to have standing." *Bras v. Cal. Pub. Utils. Comm'n*, 59 F.3d 869, 873 (9th Cir. 1995); *see also Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 406 (6th Cir. 2019).  Thus, Plaintiffs must allege standing to sue for both the monetary damages and the prospective relief they seek.

*Jacksonville*, 508 U.S. 656, 666 (1993)).)  For example, in *Jacksonville*, a case involving an association challenging a city's ordinance giving preferential treatment to minority-owned businesses in an award of city contracts, the Supreme Court stated:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.  The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

508 U.S. at 666; *see also Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (holding prospective student had standing to challenge university's "use of race in undergraduate admissions" because he was "able and ready to apply" but had been denied the opportunity to compete for admission on an equal basis).

Plaintiffs further contend that courts have applied this logic to the Title IX context, citing *Pederson v. Louisiana State University*, 213 F.3d 858 (5th Cir. 2000).  (Opp'n at 10.) In *Pederson*, a case concerned with a university's provision of equal athletic participation opportunities for men and women and the university's failure to field a varsity women's soccer team, Plaintiffs argue the Fifth Circuit rejected any focus on the *Pederson* plaintiffs' ultimate ability to secure a position on the team.  *See Pederson*, 213 F.3d at 871.  Such a rule would "require[] too much."  *Id*.  Instead, the court in *Pederson* held "that to establish standing under a Title IX effective accommodation claim, a party need only demonstrate that she is 'able and ready' to compete for a position on the unfielded team."  *Id*.  The Fifth Circuit, in essence, found the plaintiffs had standing because there was a discriminatory barrier—the university was providing proportionally fewer participation opportunities for the women compared to the men.  *See id.*

Plaintiffs ask this Court to apply the same logic to Title IX financial aid claims because:  (1) Defendants' "provision of proportionately fewer financial-aid dollars to female student-athletes is a similarly actionable 'barrier;'" and (2) Plaintiffs "have a

protected interest in the *opportunity* to be considered for [financial aid] on equal footing, without invidious discriminatory *barriers*, even if they don't have a 'right' to [financial aid] itself." (Opp'n at 11.)  Defendants counter that:  (1) Plaintiffs have pointed to no case law supporting their novel "lost opportunity theory" in the context of Title IX financial aid claims,[14] (Reply at 7); (2) three district courts have already determined what is required to allege standing for Title IX financial aid claims, (Mem. at 15–17; Reply at 8–9); (3) no student-athletes have a protected interest in, or individualized right to, an athletic scholarship under Title IX, so Plaintiffs lack an injury-in-fact, (Mem. at 14); (4) Plaintiffs were given an equal opportunity to compete for financial aid as shown by the fact that most of them did receive financial aid, (*id.* at 13–14); and (5) Plaintiffs' reliance on equal-protection cases is misplaced, (Reply at 6–7).  Specifically, as to their last argument, Defendants contend that the equal protection cases Plaintiffs rely on involve an "'all-or-nothing' benefit (admission to an academic program or award of a contract) that the challenger was denied based on their race or gender." (*Id.* at 7.)  But, Defendants argue, Plaintiffs do not allege anything similar here because Plaintiffs were not precluded from obtaining financial aid in general.  (*Id.*)  Finally, Defendants assert Plaintiffs' comparison to *Pederson* is also misplaced because *Pederson* was concerned with a university's failure to field an entire team—another benefit that was completely unavailable and another "all or nothing" case.  (*Id.*)

---

[14]   In a footnote, Defendants argue that Plaintiffs' "lost opportunity" theory is a disparate impact theory that is unavailable under Title IX.  (Mem. at 14 n.3.)  Citing *Mansourian*, 602 F.3d 957, Plaintiffs argue that barriers and unequal opportunities erected at the institutional level concern intentional discrimination, not disparate impact.  (Opp'n at 11 n.3.)  Discussing female athletes' exclusion from the wrestling team, the *Mansourian* court stated, "Universities' decisions with respect to athletics are . . . 'easily attributable to the funding recipient and . . . always—by definition—intentional.'"  602 F.3d at 968 (citation omitted).  The 1998 *Dear Colleague Letter* also explains that "a college has direct control over its allocation of financial aid to men's and women's teams" and "such decisions necessarily are sex-based in the sense that allocation to a particular team will affect only one sex."  (ECF No. 30-5 at 5.)  Thus, in "the typical case where aid is expressly allocated among sex-segregated teams, chance simply is not a possible explanation for disproportionate aid to one sex."  (*Id.*)  The Court thus finds that Plaintiff's "lost opportunity" theory is not a disparate impact theory, but rather one alleging intentional discrimination resulting in disproportionately low financial aid to female student-athletes.

Plaintiffs present the better argument.  It is true that Plaintiffs have no individual right to a scholarship under Title IX and that they have no generalized right to see that SDSU follows the law.  *See Anders*, 2021 WL 3115867, at *17; *Beasley v. Ala. State Univ.*, 966 F. Supp. 1117, 1126 (M.D. Ala. 1997).  It is also true that the three main district court cases from across the country that have discussed a plaintiff's standing to sue for disproportionate financial aid have found that, for a plaintiff to allege standing in this context, the plaintiff must show a causal relationship between the alleged funding disparity and the diminution of her scholarship award.  *See Anders*, 2021 WL 3115867, at *17 (citing *Beasley*); *Balow v. Mich. State Univ.*, No. 1:21-CV-44, 2021 WL 4316771, at *7 (W.D. Mich. Sept. 22, 2021) (citing *Anders*); *Beasley*, 966 F. Supp. at 1126 (stating that a plaintiff's standing to assert a claim in this context "must hinge on overall disproportionate provision of support funds to athletes of each gender, and on whether she can show a relationship of causation from that overall funding disparity to the asserted withdrawal of promised financial support from her").

While the courts in *Anders*, *Balow*, and *Beasley* addressed one of the ways a plaintiff may properly allege standing for a Title IX disproportionate financial aid claim, the Court finds it significant that none of those cases involved a "lost opportunity" theory or anything similar.  Here, a decision finding Plaintiffs have standing based on their "lost opportunity" theory would not contravene those decisions because, of course, it is axiomatic that a case cannot stand for a proposition that it did not address.  Instead, the questions the Court must decide are whether there are multiple possible ways to allege an injury-in-fact for Title IX disproportionate financial aid claims and whether injuries-in-fact in other contexts can provide guidance in this context.  The Court answers these questions in the affirmative: there are multiple ways to allege injuries-in-fact for Title IX financial aid claims (even if those injuries may not be redressable by particular types of relief) and the description of injuries-in-fact in other contexts can provide guidance here.

As Plaintiffs point out, in the equal-protection context, courts have found sufficiently alleged injuries-in-fact in the employment and college admissions contexts where obstacles

or barriers to participation have injured the plaintiffs. In the college admissions context, for example, the Supreme Court has found that where 16 out of 100 spots in a medical school were "set aside" for minority applicants, a white male applicant who was rejected from the school had standing to challenge the "set aside." *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 279–280 & n.14 (1978). This is because the medical school's decision not to permit him to compete for all 100 spots in the class was the injury-in-fact regardless of whether he could prove that he would have been admitted had he been allowed to compete for all 100 spots. *See id.* And in the context of a contractor attempting to win a bid for a contract, the Supreme Court in *Jacksonville*, found that a party challenging a "set-aside" program "need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Jacksonville*, 508 U.S. at 666.

The Fifth Circuit has applied this equal-protection jurisprudence to the Title IX context regarding an effective accommodation claim. *See Pederson*, 213 F.3d at 871. As previously discussed, in *Pederson*, the court found that a university's failure to field a female varsity team to effectively accommodate the interests and abilities of the university community created a barrier for female students. *Id*. The court explained that in "much the same way as set-aside programs," the injury to the plaintiffs resulted from imposed barriers—i.e., "the absence of a varsity team for a position on which a female student should be allowed to try out." *Id.* The court held that "to establish standing under a Title IX effective accommodation claim, a party need only demonstrate that she is 'able and ready' to compete for a position on the unfielded team." *Id*.

Like the set-aside programs in the equal-protection context, the Court finds that collegiate female student-athletes bringing a Title IX disproportionate financial aid claim can allege an injury-in-fact by providing sufficient facts to show that: (1) a barrier deprived them of the opportunity to compete on an equal basis as the male student-athletes for a proportional pool of money; and (2) that they were able and ready to compete for that money. Defendants' argument that the "set-aside" cases were "all or nothing" cases does

not explain why the same logic cannot be applied to cases in which plaintiffs received part of a benefit (financial aid) but were prevented from competing for the rest of the benefit (additional financial aid) that would have been available had their university complied with Title IX.  In fact, the set-aside cases cannot all be described as "all or nothing" cases.  For example, in *Bakke*, the applicant was allowed to compete for 84 of the 100 open spots in the class—he was only precluded from applying for 16 of the spots.  *See Bakke*, 438 U.S. at 279–280 & n.14.  In other words, he was only able to compete for part of the benefit. Defendants' focus on "all or nothing" benefits is therefore misplaced, and the "able and ready" standard applies here.

There is one caveat to this holding:  the Ninth Circuit has held that where plaintiffs are seeking damages rather than prospective relief, they must show more than that they are "able and ready" to seek the benefit.  *See Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1186 (9th Cir. 2012) ("Because [plaintiff's] surviving claims are for damages rather than prospective relief, he must show more than that he is "able and ready" to seek subcontracting work.").  In *Braunstein*, a contract award case, the Ninth Circuit explained that the plaintiff needed to demonstrate that he was in a position to compete equally with the other subcontractors through evidence (or allegations) comparing himself with the other subcontractors in terms of price or other criteria.  *Id*.  If the plaintiff could show that he was in a position to compete equally and that he experienced a racial or gender barrier that impeded his ability to compete, he would satisfactorily allege standing.  *Id*.

Here, Plaintiffs allege that they experienced a sex-based barrier because SDSU placed a "monetary cap on the amount of athletic financial aid women's sports were permitted to award," which "resulted in unequal opportunities for athletic aid for female student-athletes" because the monetary caps were imposed on all women's sports but only some of the men's sports.  (SAC ¶¶ 23–24, 27–29.)  As such, female student-athletes had to compete for a disproportionately smaller pool of money.  As for the woman's rowing team, the Second Amended Complaint specifically alleges that before it was eliminated, the monetary cap placed on the rowing team permitted it to have the equivalent of twenty

athletic scholarships awarded to the female rowers—the women's rowing coach was typically given a total dollar amount of athletic financial aid equivalent to fifteen in-state scholarships and five out-of-state scholarships. (*Id.* ¶¶ 25–26.) The Second Amended Complaint also alleges that "[n]one of the Plaintiffs received all of the athletic financial aid for which she was eligible." (*Id.* ¶ 30.) The Second Amended Complaint further alleges that each Plaintiff, except for Natalie Figueroa, received some type of financial aid from SDSU. *See supra* pp. 3–4.

From these allegations, and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that the rowing team Plaintiffs, except Ms. Figueroa, sufficiently allege an injury-in-fact because they provide sufficient facts to show they were ready, able, and in a position to compete for a proportional pool of money. Each had received some scholarship already, showing they were in a position to compete for such financial aid. They also allege that, if a proportional pool of money was available, at least some of that money could have been available to the rowing team: while the number of scholarships given to the rowing team could not be increased, the amount of fifteen of the scholarships could have been increased (from in-state scholarship amounts to out-of-state scholarship amounts), such that the rowing team coach could have sought an increase in the financial aid allocated to the women's rowing team that the rowing team members, in turn, could have competed for. For purposes of seeking damages, Ms. Figueroa, however, has not shown she was in a position to compete for financial aid. The Second Amendment Complaint provides no factual allegations to this effect and, because she did not receive any financial aid, the Court cannot draw any reasonable inferences in Ms. Figueroa's favor. (SAC ¶¶ 105–11.)

While Plaintiffs on the rowing team have sufficiently alleged an injury-in-fact for their Title IX financial aid claims through their "lost opportunity" theory, the same is not true for Plaintiffs on the track and field team. Those Plaintiffs sufficiently allege that they were ready to compete for a proportional pool of financial aid and that they were qualified to do so given that they were all awarded athletic financial aid of some kind. But they fail to allege facts supporting any claim that if a proportional pool of money was available, at

least some of that money could have been available to the track and field team such that the team members could have competed for it. The Second Amended Complaint does not explain, like it does for the rowing team, how many scholarships are available to the track and field team and which of those scholarships are already capped at out-of-state costs of attendance. Indeed, the only relevant paragraph in the Second Amended Complaint states, "SDSU imposes additional dollar-amount limitations on coaches of all of the women's sports and some of the men's sports." (SAC ¶ 23.) But this allegation is not specific to the Plaintiffs at issue and seeks to give all female student-athletes standing with a single sentence. It does not provide the Court with information on what "dollar-amount limitations" were placed on the track and field team's financial aid sufficient to allege that the track and field team coach could have sought an increase in the track and field team's allotted financial aid, which the track and field team members could have, in turn, competed for.

### b.    Redressability

While the Court finds that Plaintiffs on the rowing team sufficiently allege an injury-in-fact through their "lost opportunity" theory, the Court must also decide whether the rowing team Plaintiffs allege that this injury-in-fact is redressable by a favorable decision of this Court.[15] Redressability is "a 'substantial likelihood' that the requested relief will remedy the alleged injury-in-fact."[16] *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). "To establish Article III redressability, [Plaintiffs] must show that the relief they seek is both (1) substantially likely to redress their injuries; and

---

[15]    Defendants only address redressability in a short footnote, (*see* Reply at 10 n.7), and Plaintiffs do not address it at all in their Opposition because Defendants' "argument is limited to the injury-in-fact prong," (*see* Opp'n at 8). Because standing is a jurisdictional prerequisite, however, the Court has a duty to address it sua sponte. *See Bernhardt v. County of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2002).

[16]    Whether or not Plaintiffs can provide enough evidence to recover the requested relief is another question altogether. *See Pederson*, 213 F.3d at 870 (noting that inquiring about the ability of each female athlete plaintiff to secure a position on the unfielded team is appropriate in the determination of damages during a later stage of the action).

(2) within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020). "Redress need not be guaranteed, but it must be more than 'merely speculative.'" *Id.* (citation omitted). In analyzing the redressability of Plaintiffs' claims, the Court first addresses Plaintiffs' request for damages and then addresses prospective relief as it relates to two groups of Plaintiffs who were on the rowing team before it was eliminated: (1) those who graduated or transferred schools before the Original Complaint was filed, and (2) those who are current students at SDSU.[17]

i.   Damages

Generally speaking, "a damages remedy is available for an action brought to enforce Title IX." *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992). "[U]nder Title IX, which contains no express remedies, a recipient of federal funds is nevertheless subject to suit for compensatory damages, and injunction, forms of relief traditionally available in suits for breach of contract." *Barnes v. Gorman*, 536 U.S. 181, 187 (2002) (citations omitted). In fact, "[w]hen a federal-funds recipient violates conditions of Spending Clause legislation, the wrong done is the failure to provide what the contractual obligation requires; and that wrong is 'made good' when the recipient *compensates* the Federal Government or a third-party beneficiary (as in this case) for the loss caused by that failure." *Id.* at 189. Emotional distress damages and punitive damages, however, are not available when a recipient of federal financial assistance discriminates under Title IX because these

---

[17] The Court is also concerned with whether any of Plaintiffs' claims have been mooted by the fact that some Plaintiffs are no longer students at SDSU. *See Skysign Int'l, Inc. v. City & Cnty. Honolulu*, 276 F.3d 1109, 1114 (9th Cir. 2002) (mootness is "the requirement that the controversy remain live even after the plaintiff[s] demonstrate[] initial standing"). Neither Party has addressed mootness and, while the Court may raise mootness concerns sua sponte, *see Aguirre v. S.S. Sohio Intrepid*, 801 F.2d 1185, 1189 (9th Cir. 1986) ("Because mootness is an element of justiciability and raises a question as to our jurisdiction, we consider the matter *sua sponte*."), the Court reserves judgment on this issue until the Parties have an opportunity to address it at a later stage of the proceedings. The Court does note, however, that unless an exception to mootness applies, the Court lacks jurisdiction to entertain claims for injunctive relief brought by Plaintiffs who are no longer students at SDSU. *See Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1098 (9th Cir. 2000) ("It is well-settled that once a student graduates, [s]he no longer has a live case or controversy justifying declaratory and injunctive relief against a school's action or policy.")

22

are not traditional forms of relief for breach contract—i.e., it is not within the Court's power to award these types of damages. *See id.*; *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. __, 142 S. Ct. 1562, 1569–71, 1576 (2022); *see also Party v. Ariz. Bd. of Regents*, No. CV-18-01623-PHX-DWL, 2022 WL 17459745, at *3–4 (D. Ariz. Dec. 6, 2022) (applying *Cummings* to Title IX).

Here, as far as damages for the alleged violation of Title IX financial aid requirements, Plaintiffs request "compensatory damages and other monetary relief as permitted by law." (SAC Prayer for Relief ¶ G.)  The Court has the power to award compensatory damages by awarding damages that put Plaintiffs in as good of a position as they would have been had SDSU provided proportional pools of athletic financial aid to men and women, thereby affording the female student-athletes the opportunity to compete for a proportional pool of money.  Such relief, if proven by Plaintiffs, would sufficiently redress Plaintiffs' injury.  Whether or not Plaintiffs will be able to show entitlement to compensatory damages after discovery is a different question than whether their injury is redressable.  *Cf. Juliana*, 947 F.3d at 1170.

For the foregoing reasons, the Court finds that the rowing team Plaintiffs have sufficiently alleged standing to pursue a claim for damages for SDSU's alleged violation of Title IX's financial aid provisions.

### ii.   Injunctive & Declaratory Relief

"The distinction between past and ongoing or future harms is significant because the type of harm affects the type of relief available.  Past harm allows a plaintiff to seek damages, but it does not entitle a plaintiff to seek injunctive or declaratory relief." *Kanuszewski*, 927 F.3d at 406.  That is why, "[f]or the purposes of requesting injunctive relief, a party does not have standing unless it is able to show a 'real or immediate threat that [it] will be wronged again.'" *Hightower v. City & Cnty. of S.F.*, 77 F. Supp. 3d 867, 886 (N.D. Cal. 2014) (citation omitted).  In other words, a "plaintiff who seeks injunctive relief satisfies the requirement of redressability by alleging a continuing violation." *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 995 (9th Cir. 2000).

Regarding the former student-athletes on the rowing team who were no longer attending SDSU when the Original Complaint was filed, "[i]t is well-settled that once a student graduates, [s]he no longer has a live case or controversy justifying declaratory and injunctive relief against a school's action or policy." *Cole*, 228 F.3d at 1098.  The Court thus "has no jurisdiction to entertain the claims for injunctive" or declaratory relief brought by the two named Plaintiffs who were on the rowing team, but who either graduated or transferred from SDSU before the Original Complaint was filed in this case.[18] *Id.*; *see also Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) ("The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint.").

As for the other Plaintiffs who were on the rowing team until it was eliminated in Spring 2021, and were students at the time the Original Complaint was filed,[19] the Second Amended Complaint alleges that "[w]hen SDSU announced the elimination of the women's rowing team, it pledged to honor the scholarships for all members of the team *through* their graduation date if those members of the former team remained at SDSU." (SAC ¶ 247.)  As a result, Plaintiffs claim that those "who were on the women's rowing team and who remain at SDSU continue to be harmed by SDSU's discriminatory choice to offer proportionately more athletic financial aid to male student-athletes." (*Id.* ¶ 248.) Plaintiffs assert that this "ongoing discrimination [against this group of Plaintiffs], which locks their smaller awards into place on the basis of a sex-based barrier, will persist until those former members of the women's rowing team graduate or otherwise leave SDSU." (*Id.* ¶ 249.)

As stated, Plaintiffs fail to allege a real or immediate threat that they will be harmed again.  While they label the situation as a continuing violation, Plaintiffs' allegations show

---

[18]   These Plaintiffs are Kamryn Whitworth and Eleanor Davies.  *See supra* p. 3.

[19]   The Plaintiffs in this group are Madison Fisk, Raquel Castro, Clare Botterill, Oliva Petrine, Helen Bauer, Natalie Figueroa, Alexa Dietz, and Larisa Sulcs.  *See supra* p. 3.

22-CV-173 TWR (MSB)

that what they are really alleging is a past injury—that their athletic financial aid was locked in at a discriminatorily smaller value once the rowing team was eliminated. Even assuming this constituted a continuing violation sufficient to warrant injunctive relief, Plaintiffs' Second Amended Complaint lacks any allegations showing their requested injunctive relief would redress their injury. An "injunction barring SDSU from discriminating against its female student-athletes on the basis of their sex by . . . depriving them of equal athletic financial aid," (SAC, Prayer for Relief ¶ F), would not give the rowing team Plaintiffs the chance to compete for any more money since the team no longer exists and these Plaintiffs' financial aid packages are already locked in through their graduation dates. Plaintiffs' Second Amended Complaint fails to allege, for example, that if SDSU proportionally allocated its athletic financial aid, that Plaintiffs whose sports team no longer exists, would be able to compete for the money that becomes available.[20]

### c.   Conclusion

In sum, with regard to standing as it pertains to Plaintiff's first alleged injury, i.e., the lost opportunity to compete on equal footing, the Court finds:

(1)   the named Plaintiffs who were on the woman's rowing team, except Natalie Figueroa, have sufficiently alleged an injury-in-fact that is redressable by Plaintiffs' request for damages;

(2)   Plaintiffs who were or are on the track and field team have not sufficiently alleged an injury-in-fact;

(3)   the Court lacks jurisdiction over claims for injunctive and declaratory relief by the two named rowing team Plaintiffs who were no longer students at SDSU when the Original Complaint was filed; and

/ / /

---

[20]   This could also be categorized as failing to allege an ongoing violation or a continuing injury-in-fact because Plaintiffs, whose sports team was eliminated, cannot show they are still ready and able to compete for any more money.

(4)   the named Plaintiffs who were students at SDSU when the Original Complaint was filed and were on the women's rowing team before it was eliminated have failed to allege how the injunctive relief they request would redress their alleged injury.

### 2.   *Alleged Injury 2: Smaller Financial Awards*

This Court's prior Order dismissed Plaintiffs' financial aid claim for lack of standing, finding no concrete injury-in-fact based on Plaintiffs' "smaller financial awards" theory.  The Order explained that "to establish standing to bring a denial of equal allocation of athletic financial aid claim under Title IX, Plaintiffs must show both a disparity in funding and how that disparity specifically affected each of them—i.e., that she would have received a larger scholarship if the budget had been proportional."  (ECF No. 38 at 13 (first citing *Anders*, 2021 WL 3115867, at *17; and then citing *Balow*, 2021 WL 4316771, at *7).)  The Court found that "[i]n the First Amended Complaint, while Plaintiffs allege[d] facts indicating that there was a disparity in funding . . . , they [did] not allege how that disparity affected each of them."  (*Id.*)  Importantly, the Plaintiffs' First Amended Complaint failed to allege any injury-in-fact aside from their conclusory allegation that each Plaintiff would have received more scholarship money had SDSU complied with Title IX.  (*See* ECF 24 at ¶ 21.)

In their Second Amended Complaint, Plaintiffs attempt to remedy this deficiency by alleging that "each of the Plaintiffs received a smaller financial-aid award than she would have received if SDSU had awarded financial aid in compliance with Title IX" and by supporting this claim with an average amount of financial aid per year that SDSU deprived every female student-athlete at the school.  (SAC ¶ 37; *see, e.g.*, *id.* ¶¶ 51, 58, 65, 72, 78, 85, 92, 99, 110, 117, 128, 139, 150, 157, 167, 173, 179.)  Plaintiffs allege that:  (1) in the 2018–2019 school year, SDSU denied an average of $2,608.84 to each female student-athlete at the school; (2) in the 2019–2020 school year, SDSU denied an average of $2,204.03 to each female student-athlete; and (3) in the 2020–2021 school year, SDSU

/ / /

/ / /

denied an average of $1,874.40 to each female student-athlete.  (*Id.* ¶¶ 229, 231, 233.)[21]
The Second Amended Complaint then alleges each Plaintiff was deprived of this average
amount of financial aid for the years she was a student-athlete.  For example, the Second
Amended Complaint alleges:

> The amount of damages in unequal financial aid [Plaintiff Madison Fisk]
> suffered can be calculated by using the following information, along with
> other information not currently public[ly] available: Madison was a varsity
> athlete in 2018-19, when SDSU deprived each female student-athlete of an
> average of $2,608.84; she was a varsity athlete in 2019-20, when SDSU
> deprived each female student-athlete of an average of $2,204.03; she was a
> varsity student-athlete in 2020-21, when SDSU deprived each female student-
> athlete of an average of $1,874.40; and given SDSU's commitment to honor
> her financial aid after eliminating the women's rowing team, she was eligible
> for aid in 2021-22, when SDSU deprived female students of equal financial
> aid in presently unknown amounts.

(*Id.* ¶ 51.)

According to Defendants, Plaintiffs' allegations that they received smaller financial
aid awards than they would have if SDSU had complied with Title IX—using an average
harm for all female student-athletes—still fail to plead concrete injuries fairly traceable to
SDSU for each Plaintiff.  (Mem. at 12–13.)  Defendants assert that using an average harm
does not show a particularized injury and that Plaintiffs have "done nothing to address how
the alleged disparity [in financial aid] affected each of them, individually."  (*Id.* at 13.)
Defendants further contend that Plaintiffs' theory based on average harm "inherently
depends on the notion that each Plaintiff is entitled to some minimum amount of
scholarship funding."  (Reply at 8.)

/ / /

---

[21]    Plaintiffs calculated these numbers by "subtracting the aid SDSU actually awarded to female
student-athletes in a given year from the athletic financial aid female student-athletes *would have been
awarded* if SDSU had complied with Title IX by awarding such aid proportionally" and then dividing that
number by the total number of female student-athlete participants in that year.  (SAC ¶ 230 n.4.)  The data
for the 2021–2022 and 2022–2023 school years is not yet available.  (*See id.* ¶ 234 n.5.)

Plaintiffs disagree, responding that their allegations are sufficient because "[r]equiring Plaintiffs to allege, without discovery, exactly how much each Plaintiff might have received in the counterfactual world where SDSU did not impose a sex-based barrier to financial aid and instead complied with Title IX requires the impossible." (Opp'n at 16.) Plaintiffs further contend that at this stage of the proceedings, "there is no way for Plaintiffs to trace how hypothetical dollars, already *not* awarded in previous years, would have been distributed from the athletics program to women's sports, and then from coaches to female student-athletes, if SDSU—counterfactually—awarded these dollars at all." (*Id.*)

Defendants are correct. The Ninth Circuit in *Veterans for Common Sense v. Shinseki*, while not deciding the issue, noted that "a claim based on average harm seems contrary to the Supreme Court's requirement of a 'particularized' harm that 'affect[s] [plaintiffs] in a personal and individual way.'" 678 F.3d 1013, 1027 (9th Cir. 2012) (citing *Lujan*, 504 U.S. at 560, 561 n.1). The Court agrees. What is more, Plaintiffs' allegations in this regard appear to depend on a right to an individual scholarship, and, as noted above, they do not have such a right. Plaintiffs' concern about needing to allege a particular monetary amount that each Plaintiff would have received is misguided. A particular monetary amount is not required, but something more than an average harm is. For example, in *Beasley*, the court found Plaintiff had standing to pursue a Title IX financial aid claim in part because she alleged that after she had started at the university and played a semester of volleyball, she "was then told she would not receive the promised scholarship because of a lack of funds allocated by [the university] for women's volleyball." 966 F. Supp. at 1121, 1131. Plaintiffs have not alleged anything similar to show particular and concrete injuries they each endured under their theory that they received smaller scholarships than they would have if SDSU had complied with Title IX. The Court therefore finds that Plaintiffs' conclusory and speculative allegations fail to allege an injury-in-fact under their second theory.

/ / /

/ / /

### 3.      Alleged Injury 3: Psychological and Stigmatic Harms

In previously dismissing in part Plaintiffs' First Amended Complaint, the Court noted that even though Plaintiffs opposed Defendants' motion to dismiss by stating at a hearing that they had suffered psychological harm, Plaintiffs' First Amended Complaint contained no such allegations.  (ECF No. 38 at 13.)  To correct that deficiency, Plaintiffs now allege that they have suffered and continue to suffer psychological and stigmatic harm from the alleged disparity in funding available to female student-athletes at SDSU. Specifically, Plaintiffs have added the following allegations:

(1)     "If SDSU complied with Title IX and granted athletic financial aid to its female varsity student athletes proportional to the athletic financial aid it granted to SDSU's male varsity student-athletes, each of the Plaintiffs would have been free of second-class treatment in the allocation of financial aid at SDSU."  (SAC ¶ 38.)

(2)     "[E]ach of the Plaintiffs was forced to endure an environment in which her school actively discriminated against her because of her sex."  (*Id.* ¶ 39.)

(3)     "This unequal treatment is inherently degrading and stigmatizing, and each of the Plaintiffs experienced the harms and injuries caused by SDSU's intentional decision to treat female student-athletes like second-class citizens."  (*Id.* ¶ 40.)

(4)     "Each of the Plaintiffs was treated like a second-class citizen at SDSU because of her sex, which is inherently degrading, stigmatizing, and affected each of the Plaintiff's experiences."  (*Id.* ¶ 45.)

(5)     For each Plaintiff, the Second Amended Complaint alleges that "[s]he was forced to endure *degrading and stigmatizing second-class treatment* as SDSU intentionally treated female student-athletes worse than their male counterparts when it came to athletic financial aid."  (*See, e.g.*, *id.* ¶¶ 50, 57.)

(6)     "Plaintiffs and the class members have been and are harmed by" SDSU's Title IX financial aid violations.  Such harm includes "the degrading and stigmatizing effects of" being subjected to sex discrimination.  (*Id.* ¶ 361.)

/ / /

a.   Injury-in-Fact

Defendants argue that Plaintiffs' new allegations about stigmatic harm are conclusory and Plaintiffs fail to allege "any actual effect that any of them experienced from this alleged treatment, other than generalized 'harm[].'" (Mem. at 14.)  Defendants assert that "no Plaintiff alleges that she has experienced any particularized legal harm— emotional, psychological, or otherwise—because of any policy or decision by SDSU." (*Id.*; *see* Reply at 10 ("[S]ince Plaintiffs have not plausibly alleged an injury in fact relating to SDSU's allocation of athletic financial aid, Plaintiffs cannot reasonably claim they have suffered a cognizable psychological injury based on their unfounded, subjective belief that they experienced discrimination.").)  What is more, Defendants argue, "Plaintiffs also cite no case recognizing 'psychological' or 'stigmatic harm in the context of Title IX athletic financial assistance claims, thereby underscoring the novelty of Plaintiffs' theory." (Reply at 10.)

Citing cases outside the Title IX context, Plaintiffs argue that, much like race-based classifications, sex-based classifications in the Title IX context "'carry a danger of stigmatic harm' and plaintiffs' rights 'to be treated with equal dignity and respect are implicated' by rules that dispense benefits on impermissible bases."  (Opp'n at 19.) Plaintiffs further assert that the "psychological harm of being excluded, stigmatized, denigrated, or made to feel second class on an impermissible basis . . . is a concrete injury-in-fact." (*Id.*)  In response to Defendants' argument that psychological harm standing alone is not a redressable Title IX injury, Plaintiffs contend their emotional harm does not stand alone because it is coupled with the disparity in aid, which Title IX protects against.  (*Id.* at 20.)  Finally, Plaintiffs cite a Fourth Circuit case holding that the "'emotional and dignitary harm' resulting from discrimination and exclusion 'is legally cognizable under Title IX.'"  (*Id.* (quoting *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 617–18 (4th Cir. 2020)).)

For Article III standing, the Supreme Court has confirmed that intangible injuries can be concrete.  *See Spokeo, Inc.*, 578 U.S. at 340.  Injuries-in-fact are not limited to

economic harm but extend to non-economic harm as well.  *See Friends of the Earth, Inc.*, 528 U.S. at 181–83; *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 140 F. Supp. 3d 1123, 1161 (D.N.M. 2015) (stating in an environmental harm context that "the plaintiffs may satisfy the injury-in-fact requirement by showing they have suffered a recreational, aesthetic, or other non-economic injury").  And in several contexts, courts have found that psychological or stigmatic harm resulting from denial of equal treatment may satisfy the injury-in-fact requirement of Article III standing.  *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. __, 140 S. Ct. 2335, 2355 (2020) ("[T]he Court has squarely held that a plaintiff who suffers unequal treatment has standing to challenge a discriminatory exception that favors others."); *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) (a plaintiff who suffers unequal treatment has standing to seek "withdrawal of benefits from the favored class"); *Cath. League for Religious & C.R. v. City & Cnty. of S.F.*, 624 F.3d 1043, 1052 (9th Cir. 2010) (finding the plaintiffs alleged stigmatic harm of feeling like second-class citizens because of city ordinance denigrating their religion); *see also White v. Square, Inc.*, 891 F.3d 1174, 1177 (9th Cir. 2018) (plaintiff's allegations were sufficient to satisfy Article III's requirements for a concrete and particularized injury because "discrimination itself . . . can cause serious non-economic injuries to those persons who are denied equal treatment solely because of their membership in a disfavored group" (citation omitted)); *Chattopadhyay v. BBVA USA*, No. 21-15017, 2021 WL 4958850, at *1 (9th Cir. Oct. 26, 2021) (same); *Cmty. Action League v. City of Palmdale*, No. CV 11-4817 ODW (VBKx), 2012 WL 10647285, at *2 (C.D. Cal. Feb. 1, 2012) ("[T]he mere 'stigmatization' which results from being labeled as a member of an inferior class of citizens has repeatedly been held sufficient to confer standing."); *Darensburg v. Metro. Transp. Comm'n*, No. C-05-01597 EDL, 2006 WL 167657, at *4 (N.D. Cal. Jan. 20, 2006) ("[S]tigmatic injuries may satisfy the 'injury in fact' component of standing.").  Defendants do not explain why the Court should not apply these general standing guidelines to Plaintiffs' Title IX financial aid claim here.

/ / /

Neither Party cites any cases discussing psychological or stigmatic harm in a Title IX financial aid case in the context of an injury-in-fact for standing purposes. Nor could the Court find any relevant cases. But the Fourth Circuit in a Title IX case regarding school dress codes, for example, has held that "for the plaintiffs to prevail under Title IX, they must show that: (1) they were excluded from participation in an education program or activity, denied the benefits of this education, or otherwise subjected to discrimination because of their sex; and (2) the challenged action caused them harm, which may include 'emotional and dignitary harm.'" *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 129 (4th Cir. 2022), *petition for cert. filed*, (U.S. Sept. 14, 2022) (No. 22-238); *see Grimm*, 972 F.3d at 618 ("The . . . emotional and dignitary harm to [plaintiff] is legally cognizable under Title IX."). Here, the Court finds—based on general standing principles from other contexts, and the Fourth Circuit's persuasive finding that an alleged harm in a different Title IX context could include dignitary harm—that Plaintiffs have sufficiently alleged an injury-in-fact through their psychological/stigmatic injury theory. The more difficult question is whether this injury is redressable by a favorable decision by the Court.

### b. Redressability

Defendants, citing a Sixth Circuit case, state that emotional harm "standing alone is not a redressable Title IX injury" and, in any event, the Supreme Court "recently confirmed that emotional distress damages are not available under Spending Clause statutes like Title IX." (Mem. at 14 (quoting *Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 622 (6th Cir. 2019)) (citing *Cummings*, 142 S. Ct. at 1576).) In addition, Defendants argue that Plaintiffs cannot use "their purported 'psychological harm' to keep their claims for declaratory and injunctive relief alive" because "[p]ast exposure to harmful or illegal conduct does not necessarily confer standing to seek injunctive relief if the plaintiff does not continue to suffer adverse effects." (Reply at 10 (quoting *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010)).) Defendants additionally assert, without further explanation, that "Plaintiffs also run headlong into a redressability problem: declaratory relief would not remediate any of the harms Plaintiffs purportedly suffered here." (*Id.* at

10 n.7.)  Plaintiffs counter that even if emotional distress damages are unavailable, the "psychological and stigmatic harm are injuries-in-fact sufficient to support Plaintiffs' requests for declaratory and injunctive relief."  (Opp'n at 19.)

### i.      Damages

Defendants are correct that Plaintiffs' psychological and stigmatic injuries-in-fact are not redressable by the Court through a damages award because the Supreme Court has found that emotional distress damages are not available under Spending Clause statutes similar to Title IX.  *See Cummings*, 142 S. Ct. at 1569–72, 1576.  And while *Cummings* does not directly address Title IX, several courts—for good reason—have applied *Cummings* to Title IX cases as well.  *See, e.g.*, *Party*, 2022 WL 17459745, at *3–4 (applying *Cummings* to Title IX and finding emotional distress damages unavailable in Title IX actions); *see also Doe v. Moravian Coll.*, No. 5:20-cv-00377-JMG, 2023 WL 144436, at *8–9 (E.D. Pa. Jan. 10, 2023) (same); *K.G. v. Woodford Cnty. Bd. of Educ.*, No. 5: 18-555-DCR, 2022 WL 17993127, at *2–3 (E.D. Ky. Dec. 29, 2022) (same), *appeal docketed*, No. 23-5083 (6th Cir. Feb. 1, 2023).  The Court therefore finds Plaintiffs lack standing to pursue damages for their alleged psychological and stigmatic injuries because those injuries are not redressable by a damages award.

### ii.      Injunctive & Declaratory Relief

Even though damages are unavailable to redress Plaintiffs' alleged psychological injuries, Defendants do not explain why injunctive or declaratory relief is not available or why injunctive or declaratory relief would not redress these alleged injuries.  For example, in the equal protection context, a stigmatic injury is redressable through injunctive relief "because the discrimination directly causes the stigma and its cessation by itself eliminates the stigma." *Darensburg*, 2006 WL 167657, at *6.  Thus, at a minimum, injunctive relief is generally available to redress a plaintiff's alleged stigmatic injury.  And with no argument one way or the other regarding declaratory relief, the Court assumes without deciding that declaratory relief is available to redress Plaintiffs' alleged stigmatic injury.

/ / /

But whether Plaintiffs have sufficiently alleged redressability through injunctive or declaratory relief is a different question.  As discussed above, *see supra* pp. 23–24, Plaintiffs who seek injunctive relief must satisfy the requirement of redressability by alleging a continuing violation.  *See Nat. Res. Def. Council*, 236 F.3d at 995.  As before, the Court analyzes this question as it pertains to different groups of Plaintiffs.

First, as discussed above, *see supra* p. 24, the Court has no jurisdiction to entertain claims for injunctive or declaratory relief brought by Plaintiffs who either graduated or left SDSU before the Original Complaint was filed.[22]  Any injunctive or declaratory relief could not redress their stigmatic injuries because they are no longer students at SDSU.[23]

Second, as for Plaintiffs who were on the rowing team and were still students at the time the Original Complaint was filed—as far as the Court can tell—the only mention in the Second Amended Complaint of any continuing harm relating to psychological/stigmatic injury is found in paragraph 361, where Plaintiffs allege they "and the class members have been and are harmed by" SDSU's Title IX financial aid violations, which includes "the degrading and stigmatizing effects of" being subjected to sex discrimination.  (SAC ¶ 361.)  All other references to psychological/stigmatic harm are in the past tense and refer to past injury.  While this allegation may be sufficient for current students who are still on a sports team, it is unclear to the Court how students no longer on a sports team, but still attending the school, could have their stigmatic injuries redressed by an injunction that bars SDSU's continued discrimination against female student-athletes.  Instead, these claims are inapplicable to this group of Plaintiffs who are no longer student-athletes, and the Court finds that this group of Plaintiffs lacks standing to pursue injunctive or declaratory relief to redress any stigmatic injuries.

---

[22]    These Plaintiffs are Maya Brosch, Kamryn Whitworth, and Eleanor Davies.  *See supra* at p. 3.

[23]    As previously noted, *see supra* at p. 22 n.16, the Court reserves judgment on whether claims for injunctive and declaratory relief brought by Plaintiffs who graduated from SDSU between the filing of the Original Complaint and subsequent complaints have been mooted.

Third, regarding Plaintiffs on the track and field team who were still students at the time the Original Complaint was filed—with Plaintiffs' brief allegation that the stigmatic harm is continuing and drawing all reasonable inferences in their favor—injunctive relief accompanied by declaratory relief could redress this group's alleged stigmatic injury.  As current students who are on a sports team, the discrimination that is ongoing would cease, as would any stigma.  The Court thus finds that Plaintiffs who are current student-athletes on the track and field team sufficiently allege standing to pursue prospective relief for their alleged psychological/stigmatic injuries.

c.   Conclusion

In sum, with regard to Plaintiffs' third theory for psychological and stigmatic injuries, the Court finds:

(1)   No named Plaintiffs sufficiently allege an injury-in-fact that is redressable by Plaintiffs' request for damages;

(2)   the Court lacks jurisdiction over claims for injunctive and declaratory relief by the three named Plaintiffs who were no longer students at SDSU when the Original Complaint was filed;

(3)   the named Plaintiffs who were on the women's rowing team before it was eliminated and were still students at SDSU at the time the Original Complaint was filed fail to allege how the injunctive and declaratory relief they request would redress their alleged stigmatic injury; and

(4)   the named Plaintiffs on the SDSU track and field team who were still student-athletes at the time the Original Complaint was filed sufficiently allege that their stigmatic injuries-in-fact are redressable by the injunctive and declaratory relief they seek.

*4.   Conclusion*

Based on the foregoing analysis, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss Plaintiffs' Title IX financial aid claim for lack of standing.

/ / /

### B.   Failure to State a Claim

In addition to arguing that Plaintiffs lack standing to bring a Title IX disproportionate financial aid claim, Defendants also argue that Plaintiffs have not plausibly pled a claim for disproportionate financial aid. (*See* Mem. at 17; Reply at 11.) They argue the Second Amended Complaint fails to plead a plausible Title IX violation because: (1) Plaintiffs have offered an unsupported allegation that SDSU has failed to provide proportional financial aid to male and female student-athletes such that SDSU has engaged in sex discrimination; and (2) Plaintiffs have failed adequately to address various nondiscriminatory factors that have contributed to the alleged disparity in financial aid that are apparent based on the allegations of the Second Amended Complaint, including (a) the difference between in-state and out-of-state costs of attendance, (b) SDSU's efforts to promote its women's athletic program, and (c) the impact of the NCAA's bylaws that restrict the number of scholarships that can be awarded. (Mem. at 17–19; Reply at 11–12.) Defendants assert that because "Plaintiffs do not provide sufficient 'facts tending to exclude the possibility' of various non-discriminatory reasons for any alleged financial disparity," their claims are merely possible, but not plausible. (Mem. at 20–22 (quoting *In re Century Alum. Co. Sec. Litig.*, 729 F.3d 1104, 1008 (9th Cir. 2013)) (citing *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014)); *see* Reply at 11.)

Plaintiffs dispute Defendants' description of their Second Amended Complaint and contend the Second Amended Complaint plausibly alleges a Title IX financial aid claim, pointing to specific allegations of financial aid disparity and explaining why each of Defendants' asserted nondiscriminatory reasons are insufficient to explain the disparity. (Opp'n at 20–26.) Plaintiffs also argue that they are entitled to reasonable inferences from the eleven-year pattern of disproportionate financial aid seen in the EADA data, asserting that it is "reasonable to infer that this persistent shortfall is the result of intentional sex-based discrimination." (*Id*. at 21–22.)

/ / /

Plaintiffs are correct for some of the reasons they argue, but also because Defendants impermissibly seek to shift the burden of addressing nondiscriminatory reasons for the alleged financial aid disparity to Plaintiffs, and because much of the Parties' arguments are factual disputes not appropriate for consideration at the motion to dismiss stage.

First, both Parties agree that a university's compliance with Title IX's proportional financial aid requirements is measured "by dividing the amounts of aid available for the members of each sex by the numbers of male or female participants in the athletic program and comparing the results," and that "the total amount of scholarship aid made available to men and women must be substantially proportionate to their participation rates." (Mem. at 18 (quoting the OCR's Policy Interpretation); *see* Opp'n at 20.) Plaintiffs' Second Amended Complaint provides data going back to 2010 showing that SDSU has provided female student-athletes as a group between 4.17% and 8.98% less financial aid than the proportional amount for the eleven years for which data is available.[24] (*See* SAC ¶¶ 228–333.) Further, according to the DOE's 1998 *Dear Colleague Letter*,

> [i]f any unexplained disparity in the scholarship budget for athletes of either gender is 1% or less for the entire budget for athletic scholarships, there will be a strong presumption that such a disparity is reasonable and based on legitimate and nondiscriminatory factors. Conversely, there will be a strong presumption that an unexplained disparity of more than 1% is in violation of the "substantially proportionate" requirement.

(ECF No. 30-5 at 5.) The *Dear Colleague Letter* goes on to state that, "[w]here a college does not make a substantially proportionate allocation to sex-segregated teams, the burden should be on the college to provide legitimate, nondiscriminatory reasons for the disproportionate allocation." (*Id.*) Further, "it is not enough for a college or university merely to assert a nondiscriminatory justification." (*Id.* at 4.) "Instead, it will be required

---

[24] In a footnote, Defendants argue that EADA data and Title IX data are different and Plaintiffs' financial aid claim fails because they rely on EADA data. (Mem. at 22 n.11.) Defendants' argument carries no weight because, as discussed above, at the early stages of Title IX litigation, courts can rely on EADA date. *See supra* p. 5 n.8.

to demonstrate that its asserted rationale is in fact reasonable and does not reflect underlying discrimination." (*Id.* ("For instance, if a college consistently awards a greater number of out-of-state scholarships to men, it may be required to demonstrate that this does not reflect discriminatory recruitment practices.").)   At the pleading stage, Plaintiffs provide sufficient factual allegations to support their claim that SDSU does not meet the substantially proportionate requirement.   Defendants' argument that Plaintiffs' Second Amended Complaint does not adequately address SDSU's asserted nondiscriminatory reasons for the disparity requires too much of Plaintiffs at this stage of the proceedings and seeks to shift Defendants' burden onto Plaintiffs.   Defendants' argument about Plaintiffs' Second Amended Complaint not including facts tending to exclude Defendants' "innocuous alternative explanation" is thus misplaced.  (Mem. at 22.)

Second, even if Defendants did not have the burden to provide nondiscriminatory factors, the Parties' arguments about Defendants' asserted nondiscriminatory factors are factual disputes not appropriate for resolution at this stage of the proceedings.  (*See* Mem. at 18–23; Opp'n at 22–26.)  In any event, Plaintiffs' Second Amended Complaint includes allegations that address some of the factors Defendants raise.  (SAC ¶¶ 21–29, 200–03, 241–46.)

For these reasons, the Court finds that Plaintiffs' Second Amended Complaint provides sufficient factual allegations at the pleading stage to support their claim of an unlawful disparity in financial aid under Title IX.   The Court therefore **DENIES** Defendants' Motion to Dismiss Plaintiffs' first cause of action for failure to state a claim.

### C.   *Whether Plaintiffs are Entitled to Monetary Damages*

Finally, as to Plaintiffs' Title IX financial aid claim, Defendants argue that Plaintiffs are not entitled to any monetary damages because Defendants were not on notice that they would be exposed to such liability.[25]  (Mem. at 23–24; Reply at 12–13.)  In their Motion,

---

[25]   Defendants' argument that they were not on notice under *Cummings* is misplaced.  "*Cummings*'s notice inquiry does not (contrary to [the plaintiff's] contention) call for a case-by-case evaluation of

22-CV-173 TWR (MSB)

Defendants state that "Plaintiffs are not entitled to recover monetary damages, and any such claim should be stricken." (Mot. at 2.)  Defendants do not explain what legal authority gives the Court the ability to strike part of a claim for relief; however, to the extent Defendants seek to strike Plaintiffs' request for monetary damages under Federal Rule of Civil Procedure 12(f),[26] that Rule "does not authorize district courts to strike claims for damages on the ground that such claims are precluded as a matter of law." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974–75 (9th Cir. 2010).  To the extent Defendants seek to dismiss the damages portion of Plaintiffs' financial claim under Rule 12(b)(6), the Court declines to take such a piecemeal approach.  *See Bragg Live Food Prods., LLC v. Nat'l Fruit Prod. Co.*, No. 2:22-CV-00584-SB-SK, 2022 WL 3574423, at *2 (C.D. Cal. July 22, 2022) ("[Defendant] does not address the propriety of seeking to dismiss part of a single cause of action, despite the fact that numerous courts have concluded that 'Federal Rule of Civil Procedure 12(b)(6) does not provide a mechanism for dismissing only a portion of a claim.'").  In any event, whether Plaintiffs will be able to prove any alleged monetary damages is a question better suited for a later stage in the proceedings.  The Court therefore **DENIES** Defendants' request to strike Plaintiffs' claim for monetary damages.

## II.    Claim III: Retaliation

Plaintiffs also assert a claim for retaliation against Defendants based on comments made during a track and field team meeting via Zoom on February 16, 2022.  (*See* SAC ¶¶ 298–306, 318); *see also supra* pp. 6–8.  "Title IX prohibits sex discrimination by recipients of federal education funding" and actionable "sex discrimination" includes

---

whether the particular defendant had subjective notice, at the time it chose to accept federal funds, that it could be held liable for a particular category of damages.  Rather, the inquiry rises and falls on whether the requested category of damages is a '*usual* contract remed[y] in private suits' that has been 'traditionally available in suits for breach of contract'—if not, there is 'correspondingly no ground . . . to conclude that federal funding recipients have clear notice that they would face such a remedy in private actions.'" *Party*, 2022 WL 17459745, at *4 (quoting *Cummings*, 142 S. Ct. at 1571, 1576).

[26]    Under Rule 12(f), a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).

retaliation "against a person *because* [s]he complains of sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–174, 178 (2005); *see also Emeldi v. Univ. of Or.*, 698 F.3d 715, 725 (9th Cir. 2012) (speaking out against sex discrimination is a protected activity). "The Title VII framework generally governs Title IX retaliation claims." *Emeldi*, 698 F.3d at 725. Thus "a plaintiff who lacks direct evidence of retaliation must first make out a prima facie case of retaliation by showing (a) that he or she was engaged in protected activity, (b) that he or she suffered an adverse action, and (c) that there was a causal link between the two.*" Id.* at 724.

This Court's prior Order dismissed the retaliation claim in Plaintiffs' First Amended Complaint on the grounds that the twelve named Plaintiffs who did not attend the Zoom meeting (the "Absent Plaintiffs") lacked standing to bring a retaliation claim and the Plaintiffs on the track and field team that did attend the Zoom meeting (the "Present Plaintiffs") failed to allege an adverse action. (*See* ECF No. 38 at 17–20.) The Order explained that while Plaintiffs appeared to argue that the Absent Plaintiffs had standing to sue for retaliation because they were in the "zone of interest" protected by Title IX, the Absent Plaintiffs—all former student-athletes—did not demonstrate that they were meant to be protected by the zone of interest because they were no longer associated with the SDSU athletics program. (*Id.* at 18.) The Absent Plaintiffs also failed to allege any actual harm resulting from the alleged retaliatory statements because their conclusory allegation that the retaliatory statements had a "chilling effect" on all female student-athletes' willingness to pursue Title IX claims was insufficient to state a claim under Rule 12(b)(6). (*Id.* at 19.) As for the Present Plaintiffs, while they claimed they had direct evidence of retaliation, the Court found any such claim conclusory. (*Id.*) Finally, the Court found that the Present Plaintiffs had not alleged they suffered an adverse action sufficient to state a claim for retaliation. (*Id.* at 20.)

To correct these deficiencies, Plaintiffs added the following allegations to their Second Amended Complaint:

/ / /

(1)     "During [the Zoom meeting], SDSU also threatened [the Present Plaintiffs] and the other team members by reminding them that being a varsity student-athlete was not a right, suggesting that those who brought, participated in, or supported the lawsuit— including Plaintiffs—could be removed from the team altogether."  (SAC ¶ 8.)

(2)     "[S]everal members of the women's track and field team who had been considering joining the lawsuit told Plaintiffs they would not join because of the comments made on the zoom call."  (*Id.* ¶ 10.)

(3)     SDSU's retaliation harmed each Plaintiff, "because—as a result of SDSU's retaliation—additional student-athletes declined to join the case as plaintiffs, they and other student-athletes were deterred from assisting the Plaintiffs in prosecuting the case (*e.g.*, by agreeing to participate as witnesses), and her ability to prove that SDSU was and is discriminating against her and its other female student-athletes was adversely effected."  (*Id.* ¶ 52.)

(4)     "SDSU, through its employee, women's track and field team head coach Shelia Burrell, stated—to virtually the entire varsity track and field team—that five members of the team were involved in a lawsuit against the school and that she was disappointed in those five members of the team *because* they were involved in the lawsuit."  (*Id.* ¶ 301.)

(5)     "Burrell stated she was especially unhappy with members of the team who had filed a lawsuit" and "said those involved in the lawsuit were putting their individual interests above the team's."  (*Id.* ¶ 302–03.)

(6)     "Burrell told them that being a member of the varsity women's track and [field] teams is not a right, suggesting to some of the women that those who participated in or assisted with the lawsuit could be removed from the team."  (*Id.* ¶ 305.)  "In other words, SDSU implicitly threatened those who participated or assisted in the lawsuit with removal from a team they had worked their wholes lives to join."  (*Id.* ¶ 306.)

(7)     "In addition, Burrell stated that she had received backlash from the school's athletic department because of the lawsuit."  (*Id.* ¶ 307.)  "These comments suggest that

SDSU's athletics department was also retaliating against Burrell, who was, in turn, delivering a clear message of disapproval to those involved—or who might consider becoming involved—in this lawsuit." (*Id.* ¶ 308.)

(8)   "These comments singled out the five Plaintiffs and criticized them explicitly for being involved in this lawsuit, strongly suggesting that other members of the women's track and field team should not join or participate in the lawsuit." (*Id.* ¶ 309.)

(9)   "It also subjected the five Plaintiffs present on the Zoom call to embarrassment, humiliation, and anxiety solely because they had filed a Title IX lawsuit against SDSU." (*Id.* ¶ 310.)

(10)   "[S]hortly after the Zoom meeting, several members of the women's track and field team told Plaintiffs that they had been considering joining the lawsuit but were glad they had not done so and would not do so now as a result of SDSU's comments through Coach Burrell to the team." (*Id.* ¶ 319.)

(11)   "SDSU's conduct sent Plaintiffs, all female student-athletes at SDSU, and anyone who might help them, a very clear message: be afraid." (*Id.* ¶ 333.)

Defendants argue that despite these added allegations, Plaintiffs still lack standing to bring a retaliation claim and they have still failed to allege any adverse action that they endured. (Mem. at 25–27.) Plaintiffs argue, on the other hand, that they have standing and have plausibly alleged a Title IX claim. (Opp'n at 28–30.)

### A.   Standing

Defendants focus their argument about standing on the Absent Plaintiffs, stating, "only five of the 17 named Plaintiffs were actually present during [the Zoom] meeting" and "the 12 Plaintiffs who did not attend this meeting could not have reasonably suffered any harm from a comment they did not hear (particularly not those who were never members of the women's track and field team to begin with)." (Mem. at 25; *see also* Reply at 13.) Defendants also argue that Plaintiffs' added allegation that they were harmed because other student-athletes were deterred from assisting Plaintiffs with prosecuting this

/ / /

case is harm that is "entirely speculative and misplaced because it focuses on alleged harms faced by absent putative class members, not Plaintiffs." (Mem. at 25.)

In response, Plaintiffs: (1) combine the standing issue and whether they allege a plausible retaliation claim into one discussion; (2) do not differentiate between the Absent Plaintiffs and Present Plaintiffs; and (3) seem to have abandoned their zone of interest argument, except for keeping the same passing reference to the zone of interest from their First Amended Complaint in their Second Amended Complaint. (*See* Opp'n at 28–33; SAC ¶ 320.) Because Plaintiffs do not address (in the Second Amended Complaint or their Opposition to the Motion) the Court's prior concerns about the Absent Plaintiffs' lack of standing, the Court declines to revisit its prior finding that the Absent Plaintiffs lack standing to pursue a retaliation claim. Indeed, Plaintiffs' Second Amended Complaint focuses heavily on the injury to the five Plaintiffs who attended the Zoom meeting, (*see* SAC ¶¶ 8, 301, 305–09), underscoring the fact that those Plaintiffs are the only ones who have standing to bring a retaliation claim. Plaintiffs point to no authority to support their claim that plaintiffs with such an attenuated relationship to any harm, like the Absent Plaintiffs here, should nonetheless have standing.

The Court thus finds that Plaintiffs have failed to provide sufficient factual and legal support for their allegation that the Absent Plaintiffs have standing to pursue a retaliation claim. Accordingly, the Court **GRANTS** Defendants' Motion as to the Absent Plaintiffs' lack of standing to assert a retaliation claim.

### B.    Failure to State a Claim

As for whether the Present Plaintiffs have stated a retaliation claim, Defendants argue the Present Plaintiffs still fail to allege that "SDSU ever took any actual adverse action against them." (Mem. at 26.) Instead, Defendants argue, these Plaintiffs only allege that they felt embarrassed, singled out, and anxious because of potentially insensitive or offensive remarks—allegations not sufficient to state a claim for retaliation. (*Id.* at 27.)

In response, Plaintiffs abandon their argument that there is direct evidence of retaliation, instead focusing on the elements required to show circumstantial evidence of

retaliation.  (Opp'n at 28–30.)  They argue that the Parties' dispute concerns only whether Plaintiffs have sufficiently alleged the adverse action element of retaliation.  (*Id*. at 28–29.)  They further argue that comments that intimidate or threaten are themselves adverse actions, "particularly when undertaken in an effort to interfere with the claimants' ability to pursue Title IX claims."  (*Id*. at 29.)  The intimidating and threatening comments at issue here include when SDSU isolated the five Present Plaintiffs and "warned that 'being a member of the varsity women's track and [field] teams is not a right'"—in effect, threatening that those who participated or assisted in the lawsuit may be removed from the team.  (*Id*.)  Plaintiffs allege that "this threat caused the five [P]resent Plaintiffs 'embarrassment, humiliation, and anxiety'" and "deterred [other student-athletes] from assisting the Plaintiffs in prosecuting the case."  (*Id*. at 29–30; SAC ¶ 122.)  Defendants briefly argue that the alleged threat is insufficient to qualify as an adverse action.  (Reply at 14.)

Under Title IX, "the adverse action element is present when 'a reasonable [person] would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable [person] from making or supporting a charge of discrimination.'"  *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 868 (9th Cir. 2014) (citation omitted).  And the Title IX regulations state, "No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [T]itle IX or this part, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part. Intimidation, threats, coercion, or discrimination, . . . for the purpose of interfering with any right or privilege secured by [T]itle IX or this part, constitutes retaliation."  34 C.F.R. § 106.71(a).

/ / /

/ / /

/ / /

Citing *Brown v. City of Tucson*, 336 F.3d 1181, 1192–93 (9th Cir. 2003),[27] Plaintiffs argue that an adverse action "may take 'the form of coercion, intimidation, threats, or interference,'" and that the harm from the retaliation can result from the threat itself. (Opp'n at 29.)  Plaintiffs further contend that "direct harms resulting from a threat—such as feeling 'extremely stressed, harassed, and pressured'—are actionable."  (*Id.* (quoting *Brown*, 336 F.3d at 1193).)  Defendants, on the other hand, argue "[n]o reasonable person would be dissuaded from filing a Title IX claim simply because someone might refer to that claim as a 'distraction' or 'disappointing.'" (Mem. at 27.)  Defendants briefly mention *Brown* and state that the isolated comments discussed by Plaintiffs are more similar to comments the court in *Brown* found not actionable as opposed to the comments in *Brown* the court found actionable.  (Reply at 14.)  Defendants focus on caselaw explaining that isolated remarks do not give rise to a retaliation claim.  (*See id.* at 14 (citing *Monroe v. McDaniel*, 386 F. App'x 714, 715 (9th Cir. 2010).)

Defendants, however, do not directly address Plaintiffs' argument about Coach Burrell's comments being threats to remove the Present Plaintiffs from the track and field team if they participated in the lawsuit.  (*See generally* Mem.; Reply.)  Nor do Defendants provide any information or argument about the meaning of 34 C.F.R. § 106.71.  This alone could be grounds to deny Defendants' Motion to Dismiss the Present Plaintiffs' retaliation claim.  Even so, to make out a prima facie case of retaliation, "a plaintiff need only make a minimal threshold showing of retaliation."  *Emeldi*, 698 F.3d at 724.  Here, the Court finds that a warning implicitly threatening the Present Plaintiffs with removal from the track and field team if they were to continue with the lawsuit "well might have dissuaded a reasonable [person] from making or supporting a charge of discrimination."  *Ollier*, 768

---

[27]     *Brown* is not a Title IX case.  Instead, it interprets a statutory provision of the Americans with Disabilities Act that prohibits interference, coercion, intimidation, and threats against an individual in the exercise of their enjoyment of any right protected by that statute.  *Brown*, 336 F.3d at 1192.  The provision is similar to 34 C.F.R. § 106.71, but neither Party addresses how the words in 34 C.F.R. § 106.71 should be defined or interpreted, or if the interpretation of the provision in *Brown* can be applied to 34 C.F.R. § 106.71.

F.3d at 868 (citation omitted); *see Rivers v. Potter*, 05-4868 (JLL), 2007 WL 4440880, at *9 (D.N.J. Dec. 18, 2007) ("[B]oth the temporary issuance of a letter of warning, and the later reduction of the letter to an official discussion comprise actions that would cause an employee to reconsider bringing an EEO charge."). In fact, Plaintiffs allege that the Coach's threat did dissuade other members of the track and field team from participating in the lawsuit. (*See* SAC ¶ 319.) Considering the language of 34 C.F.R. § 106.71, the Court finds that Plaintiffs have sufficiently alleged, at this stage in the proceedings, that SDSU, through Coach Burrell, intimidated and threatened the Present Plaintiffs because they filed a Title IX complaint. (*See* SAC ¶¶ 8–9, 301–19.)

Finally, Defendants contend the damages portion of Plaintiffs' retaliation claim must be dismissed because Plaintiffs cannot recover emotional distress damages under Title IX. (Mem. at 28.) As before, *see supra* pp. 38–39, the Court declines to strike particular damage portions of Plaintiffs' claims at this stage in the proceedings.[28] *See Bragg Live Food Prods., LLC*, 2022 WL 3574423, at *2 ("[Defendant] does not address the propriety of seeking to dismiss part of a single cause of action, despite the fact that numerous courts have concluded that 'Federal Rule of Civil Procedure 12(b)(6) does not provide a mechanism for dismissing only a portion of a claim.'"). The Court therefore **DENIES** Defendants' Motion to the extent it seeks dismissal of the Present Plaintiffs' retaliation claim for failure to state a claim.

/ / /

/ / /

---

[28]    Plaintiffs also seek an award of nominal damages as part of their retaliation claim. (SAC Prayer for Relief ¶ H.) The Court notes that some courts have allowed nominal damages for Title IX violations but have found that nominal damages cannot be a substitute for damages that might be proven but are otherwise unavailable, like emotional distress damages in Title IX cases. *See Moravian College*, 2023 WL 144436, at *9; *Doe ex rel. Doe v. City of Pawtucket*, No. 17-365-JJM-LDA, 2022 WL 4551953, at *4 (D.R.I. Sept. 29, 2022); *Hejmej v. Peconic Bay Med. Ctr.*, No. 17-cv-782 (JMA) (SIL), 2022 WL 5429675, at *8 (E.D.N.Y. July 5, 2022). The Parties make no argument about Plaintiffs' request for nominal damages, and the Court will not address it at this stage of the proceedings.

*C.     Conclusion*

In sum, the Court finds that the Absent Plaintiffs have failed to allege standing to pursue a retaliation claim and that the Present Plaintiffs have sufficiently alleged a retaliation claim.   The Court thus **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss Plaintiffs' claim for retaliation in the Second Amended Complaint.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion as follows:

(1)     Under Plaintiffs' "lost opportunity" theory, Plaintiffs previously on the rowing team, except Ms. Figueroa, sufficiently allege an injury-in-fact that is redressable by Plaintiffs' request for damages;

(2)     The Court lacks jurisdiction over claims for injunctive and declaratory by the three named Plaintiffs who were no longer students at SDSU when the Original Complaint was filed;

(3)     Plaintiffs who were previously on the rowing team and who were still students at SDSU at the time the Original Complaint was filed fail to allege how the injunctive and declaratory relief they request would redress any of their alleged injuries;

(4)     Plaintiffs on the track and field team fail to allege sufficient facts to show they have standing under the "lost opportunity" theory;

(5)     No named Plaintiffs sufficiently allege they suffered an injury-in-fact under Plaintiffs' "smaller financial award" theory;

(6)     No named Plaintiffs sufficiently allege an injury-in-fact under the "stigmatic harms" theory that is redressable by Plaintiffs' request for damages;

(7)     The named Plaintiffs on the SDSU track and field team who were still student-athletes at the time the Original Complaint was filed sufficiently allege that their stigmatic injuries-in-fact are redressable by the injunctive and declaratory relief they seek;

(8)     Plaintiffs that have standing plausibly allege a Title IX financial aid claim;

(9)    The Absent Plaintiffs fail to allege standing to pursue a retaliation claim; and

(10)    The Present Plaintiffs plausibly allege a retaliation claim.

Finally, the Court **GRANTS** Plaintiffs leave to file a Third Amended Complaint addressing the above-enumerated deficiencies <u>within thirty (30) days of the date this Order is electronically docketed</u>, with the exception that Plaintiffs may not make further attempts to allege the Absent Plaintiffs have standing to bring a retaliation claim because any amendment in that regard would be futile.  *Should Plaintiffs elect not to file a timely amended complaint, this action will proceed as to those Plaintiffs who have standing for each cause of action*.

**IT IS SO ORDERED.**

Dated:  April 12, 2023

Honorable Todd W. Robinson
United States District Judge