# Deposition Transcript

Case Number: 3:22-cv-00173-TWR-MSB
Date: December 10, 2024

In the matter of:

# MADISON FISK, et al. v BOARD OF TRUSTEES OF THE CSU, et al.

# Jenny Bramer



Reported by:
Maria M. Siatkowski

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF CALIFORNIA

 3                        - - -

 4   MADISON FISK, RAQUEL        )  Case No.:
     CASTRO, GRETA CASTRILLON,   )
 5   CLARE BOTTERILL, MAYA       )  3:22-cv-00173-TWR-
     BROSCH, HELEN BAUER,        )  MSB
 6   CARINA CLARK, NATALIE       )
     FIGUEROA, ERICA             )
 7   GROTEGEER, KAITLIN HERI,    )
     OLIVIA PETRINE, AISHA       )
 8   WATT, KAMRYN WHITWORTH,     )
     SARA ABSTEN, ELEANOR        )
 9   DAVIES, ALEXA DIETZA, and   )
     LARISA SULCS,               )
10   individually and on         )
     behalf of all others        )
11   similarly situated,         )
                                 )
12        Plaintiffs,            )
                                 )
13        vs.                    )
                                 )
14   BOARD OF TRUSTEES OF THE    )
     CALIFORNIA STATE            )
15   UNIVERSITY, and SAN DIEGO   )
     STATE UNIVERSITY,           )
16
          Defendants.
17                        - - -

18     REMOTE VIDEOTAPED DEPOSITION OF JENNY BRAMER

19

20

21

22

23
       REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
24     WITHOUT AUTHORIZATION FROM THE CERTIFYING
       AGENCY
25
```

1  AD of people and culture.  But there's all
2  sorts of policies and procedures that I help
3  others make sure that they're following.
4         Q.    Can you give me some examples?
5         A.    Sure.  So like when I was working
6  with sports medicine, you know, there's intake
7  for when a -- a recruit is coming and how they
8  keep track of their medical things.  Or if
9  somebody has a concussion, we've come a long
10 ways in how that's identified.
11              So I'm not necessarily always the
12 one making the policy, but I am the one that is
13 helping make sure that it's happening.
14        Q.    Is there any policy -- written
15 policy that governs the budgeting process for
16 team?
17        A.    There's probably one million written
18 policies for governing the budgeting process.
19 We'd have to ask the budgeting people
20 specifically in the business office.
21        Q.    And I guess I should be a little
22 clearer.  When I'm talking about written
23 policies, I mean written by SDSU, not
24 necessarily -- I know that there are NCAA rules
25 that govern the budgeting process as well.

1               I'm more looking at the -- you know,
2    things that are drafted and promulgated by
3    SDSU.
4         A.    And that's what I was talking about
5    too.
6         Q.    Okay.  I just wanted to make sure
7    we're on the same page.
8         A.    Yeah.
9         Q.    Are there any written policies that
10   govern how coaches distribute athletic
11   financial aid?
12        A.    Athletic aid is provided by the
13   athletics department.
14        Q.    And is there anything that tells
15   coaches, you know, this is the factors that you
16   used when determining, you know, which student
17   athlete should get aid or how much aid each
18   student athlete should get?
19        A.    Coaches have discretion to recruit
20   and populate their team how they want and with
21   the expectations of, you know, competitive
22   success and good citizenship.
23              So the process of actually
24   identifying them does not have a policy.
25   The -- the act of actually providing it to

1  them, there would be policies.
2       Q.   Do you know where those policies are
3  located?
4       A.   Yeah.  They would be within the
5  financial aid office in NCAA rules compliance.
6       Q.   So those are NCA policy -- NCAA
7  policies, not necessarily SDSU policies?
8       A.   Some of both.  So the NCAA has
9  expectations related to, you know, what a
10 certain -- other people are more qualified than
11 me so I'll speak generally about this.
12           But there's certain expectations of
13 how much a student athlete can receive in the
14 NCAA rules.  So then there's tracking processes
15 that we as a university may use to keep track
16 of that person.
17      Q.   If you're working with your sport as
18 a sport liaison, are there any written policies
19 that govern, like, requesting equipment for the
20 team?
21      A.   Not as a sport liaison that we
22 require of them.
23      Q.   Okay.  Is there a policy that, like,
24 the coaches have that applies to them, you
25 know, this is how you go about requesting

```
 1   equipment for your team?
 2        A.   I do not know the specifics of any
 3   of that.  They work directly with the equipment
 4   office to order based on certain vendor
 5   timelines of when they provide what they want.
 6        Q.   Okay.  What about for obtaining
 7   gear, like, their practice gear, their
 8   uniforms, is there a written policy telling
 9   coaches how that must be done?
10        A.   Same answer.  When you said
11   "equipment" before I was thinking apparel.
12   When you -- when you were saying equipment,
13   were you meaning something different than
14   apparel?
15        Q.   Yes.  Equipment like, you know,
16   lacrosse sticks, tennis rackets, shoulder pads
17   for football players.  The -- the equipment
18   that is needed to play the sport, not
19   necessarily the apparel that they're wearing.
20        A.   Okay.  So again, the equipment
21   office is the lead on most of those things.  It
22   may not happen in the same way depending on
23   whether our Nike apparel is specific to -- they
24   have that or not.  But then the equipment room
25   continues to support them in those other
```

 1  equipment-related needs.
 2       Q.   Is there one individual who oversees
 3  all of that?
 4       A.   Yes.  Angie Garza is the director of
 5  our equipment services.
 6       Q.   Is that G-A-R-Z-A?
 7       A.   Correct.
 8       Q.   Just because I know the court
 9  reporter is going to ask later.
10            ATTORNEY BULLOCK:  Can we go
11  off record?
12            THE VIDEOGRAPHER:  We are now
13  off the record.  The time is 1:05 p.m. Pacific
14  Time.
15         (Short recess taken.)
16            THE VIDEOGRAPHER:  We are now
17  on the record.  The time is 1:13 p.m. Pacific
18  Time.
19  BY ATTORNEY BULLOCK:
20       Q.   Jenny, I want to clear up a couple
21  of things just going back over my notes.
22            Okay.  So we talked about the
23  doctor's office and the women's clinic.  I just
24  want to make sure the record is clear.
25            In Fowler, in the trainer's

 1   center -- training center, there is a
 2   physician's office; correct?
 3        A.   Correct.
 4        Q.   Is there a separate women's clinic
 5   located somewhere?
 6        A.   There is not.  It is a -- specific
 7   to the experience the student athletes have in
 8   scheduling and the resource they receive from
 9   the physician.
10        Q.   Okay.  So it's all within that
11   office in Fowler?
12        A.   Correct.
13        Q.   You just -- depending on what the
14   student athlete needs, they can schedule with
15   the physician who specializes in the women's
16   issues?
17        A.   Yes.
18        Q.   Okay.  And -- or they could schedule
19   with a general physician?
20        A.   Correct.
21        Q.   Okay.  I just wanted to make sure.
22             And then you have made a statement
23   that all of the tracking and -- and ensuring of
24   the NCAA guidelines is done by the financial
25   aid office.  And so that they might have the

```
 1  COMMONWEALTH OF PENNSYLVANIA  )
                                  )
 2  COUNTY OF BUTLER              )

 3
                      CERTIFICATE
 4
              I, Maria M. Siatkowski, a Notary
 5    Public, in and for the Commonwealth of
      Pennsylvania, do hereby certify that the
 6    witness, JENNY BRAMER, was by me first duly
      sworn to testify the truth, the whole truth,
 7    and nothing but the truth; that the foregoing
      deposition was taken at the time and place
 8    stated herein: And that the said deposition was
      recorded stenographically by me and then
 9    reduced to typewriting under my direction, and
      constitutes a true record of the testimony
10    given by said witness.

11            I further certify that the inspection,
      reading and signing of said deposition were
12    waived by counsel for the respective parties
      and by the witness.
13
              I further certify that I am not a
14    relative, employee or attorney of any of the
      parties, or a relative or employee of either
15    counsel, and that I am in no way interested
      directly or indirectly in this action.
16
              IN WITNESS WHEREOF, I have hereunto
17    set my hand and affixed my seal of office this
      11th day of December 2024.
18
                      _____
19                    Maria M. Siatkowski

20
                      Notary Public
21                    Registered Diplomate Reporter
                      Certified Realtime Reporter
22                    Certified Realtime Captioner
                      My Commission Expires June 15, 2025
23

24

25
```