**Fisk, et al. v. California State University, San Diego**

**January 10, 2025**

**Prepared by:**

**Timothy J. O'Brien, Esq.**

and female student-athletes. Importantly, the University made summer aid available to all student-athletes who wished to apply for it consistent with the terms of the summer aid policy. Historically, the University distributed reminders of the availability of the aid and the related process through the coaches, made it know via Student-Athlete's Right to Know policy on the internet, and ultimately directly notified all student-athletes of the policy and the availability of the aid.

I would note that in Dr. Lopiano's report she indicated that she was unaware of any nondiscriminatory factors that would explain any disparity in the award of athletics related financial assistance. (Plaintiffs' Expert Report, p. 30, n.9). Given the neutral nature of the University's policy in this regard, if Dr. Lopiano had considered the policy and summer aid award factors, it likely would have significantly altered her findings and overall conclusions on the award of athletics related financial aid.[8]

### C.   Calculation of Monetary Value of the Differences

On pages 30-33 of Plaintiffs' Expert Report, Dr. Lopiano purports to describe how a past imbalance in the award of athletics related financial aid should be calculated.[9] At the outset, I note that there is no regulatory requirement, governmental guidance, or court decision cited in support of her discussion in this regard and I do not know of any authority to that effect. Consistent with that observation, I have not seen this type of methodology employed in the past. Quite to the contrary, the traditional approach used by OCR for a past imbalance in the award of athletics

---

[8] Even if Dr. Lopiano had properly combined both the grants-in-aid and the summer aid initially, she would still have had to consider the nondiscriminatory reasons for the award of the summer aid portion of the total amount. If she had done so, it would have brought her back to the analysis of just the grants-in-aid consistent with the discussion set forth previously in this report.

[9] Dr. Lopiano uses the same approach and similar description in the report she submitted in support of the Plaintiffs' motion for class certification. The reasons in support of my disagreement with her approach as set forth in this report apply with equal force to the report she submitted in support of the motion for class certification.

14

related financial aid is not the award of money, but rather a directive to the university to correct the issue going forward, even if it means to do so during the current academic year.

Moreover, Dr. Lopiano's approach creates an escalator that would potentially award student-athletes amounts far in excess of the amount of money equal to the difference between the percentage of aid awarded to each gender and their athletic participation percentage. In addition, her view appears to be that monetary payments should be made in the form of damages to correct the past alleged imbalance. However, her approach is completely inconsistent with the way that scholarships are awarded, which are based on highly individualized aid awards to specific student-athletes.

While my view is that there is no basis for an award of current scholarship money to correct past imbalances, even if there was a basis to do so it would necessarily have to be limited to an amount that would have been necessary to bring the award of aid to female student-athletes to within 1% of exact proportionality (because that would have presumptively been considered compliant). This approach contrasts sharply with Dr. Lopiano's escalator approach.

By way of example, I will use Dr. Lopiano's calculation of the difference between the the athletics financial aid awarded to female student-athletes in 2022-2023 with their athletic participation percentages as set forth p. 29 of her report (Table 5)[10]. I will then calculate the corresponding monetary value that makes up the percentage-based difference to equate to exact proportionality and then to within 1% of exact proportionality.

---

[10] As I explained above, I disagree with her combination of scholarship aid and summer aid and her overall totals and related analysis, but I am using them here solely for the purpose of explaining the lack of validity in her approach. In addition, while my math differs very slightly from Dr. Lopiano's, I am still using her numbers.

15

| 2022-2023 | Male | | Female |
|---|---|---|---|
| Unduplicated | 214 | | 219 |
| Total | | 433 | |
| Athlete % | 49.4% | | 50.6% |
| Scholarships | $4,769,699 | | $4,281,479 |
| Total | | $9,051,178 | |
| Scholarship % | 52.7% | | 47.3% |
| Differential % | | -3.3% | |
| | | | |
| If exact % in $ | ("should have been") | | $4,577,847.53 |
| Difference | (from what awarded) | | **$296,368.53** |
| If within 1% | | | 49.6% |
| If within 1% in $ | | | $4,487,335.75 |
| Difference | (from what awarded) | | **$205,856.75** |

The above chart shows that if the female student-athletes had been awarded 50.6% of the total aid that was awarded that year ($9,051,178), they theoretically would have been awarded $4,577,847.53 which amounts to $296,368.53 more than they were actually awarded. The chart also shows that if they had been awarded 49.6% of the total aid (to reach the 1% presumptive compliance level), they would have been awarded $4,487,335.75 which is $205,856.75 more than they were awarded.[11]

However, instead of employing a similar calculation in this manner, Dr. Lopiano takes a different approach that has the effect of increasing the monetary value of the percentage based differential. In her view, a new and higher overall total amount of aid for each year should be calculated (even though the higher amount was never awarded) so that female student-athletes can

---

[11] While I have already indicated that there is no authority of which I am aware allowing for any past award of scholarship dollars, if there was one, my sense is that this number representing the one percent permissible variance would be the appropriate one to consider.

16

receive a percentage of that higher amount based on their athletic participation percentage. The chart set forth below reviews her position in that regard.

| 2022-2023 | Male | | Female |
|---|---|---|---|
| Unduplicated | 214 | | 219 |
| Total | | 433 | |
| Athlete % | 49.4% | | 50.6% |
| Scholarships | $4,769,699 | | $4,883,377 |
| Total | | $9,653,076 | |
| Scholarship % | 49.4% | | 50.6% |
| Differential % | | 0.0% | |
| | | | |
| Difference | (should have been awarded) | | **$601,898.00** |

In Dr. Lopiano's view, even though the actual aid total for the year was $9,051,178 (as referenced in the previous chart), that amount should be increased by an additional $601,898.00. By doing so, if the female student-athletes received a percentage of that new amount at their athletic participation rate of 50.6%, they would be entitled to an additional $601,898.00. In other words, instead of just identifying the current amount of the purported difference in the aid as I did in the previous chart, Dr. Lopiano increased the overall total. She then increased the theoretical allocation of the aid to the female athletes consistent with the amount of the increased overall total. She then opined that this new and much larger number equates to the shortfall in financial assistance. In addition, her report omits the any discussion or projected amounts based on the permissible 1% variance authorized by the Bowling Green letter, and instead, her inflated calculations are premised on exact proportionality.

In short, instead of dealing with the actual aid amounts that were awarded, she injected an artificial multiplier to increase the overall value of the alleged difference in aid. However, as

17

indicated previously, I am unaware of any authority for employing such a calculation and I have not seen it used previously to calculate a purported entitlement to past "damages". At the end of the day, her approach just doesn't make sense in the athletics financial aid context and is an effort to monetize past differences in aid awards.[12]

In addition to the issues that I have with her methodology in this regard, there are many other practical issues with this approach. Scholarships are awarded by coaches based on the merit, ability and performance of individual student-athletes and not in a sweeping and standardized manner suggested by Dr. Lopiano's report. Dr. Lopiano's approach fails to include any discussion on how this very fact specific decision making by each of the head coaches concerning each of the student-athletes would be considered.

The head coach of each team makes very focused, thoughtful, separate and individual decisions on who to award scholarships to and the related amounts. Other than existing NCAA limits on scholarships (which vary by sport), for almost all teams, there isn't a standardized approach to the decision making on how many players will be awarded scholarships and the value that will be attached to each. Dr. Lopiano's report does not contain any acknowledgment of the individualized decision making associated with the granting of scholarship awards that is included in her analysis. In addition, there is no recognition of the differences between the "headcount" sports where only full scholarships are awarded and "equivalency sports" where either partial or full scholarships are awarded. While each of them requires a significant amount of decision making by each team's coach on a student-athlete to student-athlete basis, the distribution of the

---

[12] Dr. Lopiano's approach appears to emanate from the manner in which participation disparities are identified and analyzed under Title IX's accommodation of interests requirement. However, that analysis is distinctly different than determining a financial aid difference under Title IX's financial aid requirement and the guidance contained in the Bowling Green letter.

18

scholarships in the equivalency sports is even more surgical and nuanced from student-athlete to student-athlete. For example, a coach with 18 scholarships and a team of 40 student-athletes may award 40 different variations in the amounts of aid to all, some or most of the student-athletes, based on their merit, ability, performance, and contributions individually and to the team.

Depending on how her calculation of the purported unpaid financial aid would be distributed, her analysis also omits any discussion on the situations where potential additional awards might exceed a student-athlete's full cost of attendance which is the maximum amount of a scholarship that can usually be received under NCAA Bylaw 15.1. Her analysis also fails to consider the fact that the additional award of scholarship money may result in teams exceeding the scholarship limits imposed by the NCAA. Such a result could jeopardize the eligibility of individual teams and/or existing student-athletes' eligibility to compete in current or future NCAA competitions. Each and every one of these decisions on any financial aid awards would have to be done on an individual basis so that all these factors are considered and eligibility preserved.

Finally, to the extent that some individuals are former student-athletes and no longer enrolled at the University, they will not be eligible to be awarded athletics related scholarship aid, but again her analysis omits any discussion of how to address this issue.

The bottom line is that from a practical perspective, scholarship funds are not (and cannot be) indiscriminately doled out in a standardized or formulaic manner. Instead, each award requires a deliberate, thoughtful, and methodical assessment and decision-making process by each of the head coaches as to who the recipients of scholarship aid should be and how much they should be awarded. Indeed, a quick review of the numbers in 2023-2024 reveal the complexity of this process. During that year there were head coaches of 12 women's teams and a total of 210 female student-athletes and each coach has to go through an independent consideration and decision-

19

making process for the award of scholarships to all of those athletes.[13] Because of that, there is no standardized, uniform, and formulaic approach that can be employed in the award of athletically related financial assistance.

### D. Treatment and Benefits

At the outset, I would note that Dr. Lopiano's limitation of her evaluation methodology to just three levels (superior, adequate, and inadequate) does not provide a sufficient level of differentiation to more appropriately reflect the variations that exist within each of the treatment areas. The addition of just two more levels would allow for a level of evaluation that more accurately reflects the actual assessment.

Furthermore, her restriction to just three levels combined with her methodology of using the percentage of male and female student-athletes that she believes experience that corresponding level of treatment allows the end result to be skewed in each area.[14]

In addition, our respective assessments differ significantly in many areas and after reviewing her assessments and those made by me in my initial report, I continue to believe that my assessments are accurate. With that said, I will highlight some (but not all) of the areas that illustrate the level of disagreement that we have in the treatment areas listed below.

1. Equipment

While I agreed with Dr. Lopiano that an analysis of many of the treatment and benefit areas are qualitative in nature and viewed through the lens of the observer, at the outset, I struggle with

---

[13] For the purposes of this brief discussion, I am once again using Dr. Lopiano's numbers contained at p. 23 of her report, Table 1.
[14] While I recognize that different methodologies can be used, under her approach the size of the football team effectively dictates the finding that she will reach. In contrast, if her conclusions were limited to the team-by-team ratings contained in her exhibits, the Judge/Factfinder could assess them (as well as the ones that I made) and make any related determinations.

20

F.       **Modifications to My Initial Report**

Attached at Exhibit 3 are the revisions to my initial report that reflect the grant-in-aid and summer aid numbers that are referenced in this report. In effect, I have revised my original charts on the grant-in-aid numbers for each year and the corresponding observations related to them.

## CONCLUSION

As indicated previously, this report discusses many, but not all, of the issues that the I identified with Dr. Lopiano's report. For example, among other things, I did not get into a substantive analysis of our different counts of the student-athletes because I was able to use her counts to still show results of the University's compliance initiatives. With that caveat aside, this report was prepared with the information that I have received as of today's date. Because discovery remains ongoing, I respectfully reserve the right to amend, supplement, or revise this report based upon the receipt of new, additional, or clarifying information that is relevant to the content of this report.

Dated: January 10, 2025                                            /s/ Timothy J. O'Brien
                                                                               Timothy J. O'Brien