# Report by
# DONNA LOPIANO, PH.D.

**MADISON FISK, RAQUEL CASTRO, GRETA CASTRILLON, CLARE BOTTERILL, MAYA BROSCH, HELEN BAUER, CARINA CLARK, NATALIE FIGUEROA, ERICA GROTEGEER, KAITLIN HERI, OLIVIA PETRINE, AISHA WATT, KAMRYN WHITWORTH, SARA ABSTEN, ELEANOR DAVIES, ALEXA DIETZ, and LARISA SULCS, individually and on behalf of all those similarly situated**

**v.**

**BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY and SAN DIEGO STATE UNIVERSITY,**

**February 19, 2025**

**I.      SCOPE OF OPINIONS TO BE RENDERED**

1.      On November 22, 2024 I submitted my initial expert report (the "Initial Report") related to class certification in this case in which I explained the methodology to be used to calculate, on a classwide basis, the amount "all female students who participated in intercollegiate varsity athletics at San Diego State University from the 2018-2019 academic year to the present and did not receive all of the athletic financial aid they could have received" (the "Class")" should be paid to compensate them if it was determined that they were denied the opportunity to receive athletic financial aid substantially proportionate to their participation rates in intercollegiate athletics at SDSU.

2.      In this report, I was asked to rebut any information in the Defendants' expert's report of January 10, 2025, (the "O'Brien Rep.") concerning my methodology that I believe to be incorrect and to supplement my Initial Report based on new information provided to me to date.

3.      My report is based on the information currently available to me. I reserve the right to further supplement this report if/when I receive additional information during the course of discovery that affects my opinions.

**II.     NEW DOCUMENTS, DATA, OR INFORMATION CONSIDERED IN THE FORMATION OF MY OPINIONS SINCE MY INITIAL REPORT**

4.      If I have relied on new information, I provide citations as footnotes within the content of this report.

**III.    NO OBJECTION TO MY METHODOLOGY WITH REGARD TO COMPUTATION OF TOTAL ATHLETICS FINANCIAL ASSISTANCE**

5.      First, Mr. O'Brien appears to object to the <u>result</u> of my methodology (rather than the methodology itself) in determining the "total athletics financial assistance" that must be distributed proportional to male and female athletics participation. Consistent with the requirement of Title IX, "total athletics financial assistance" consists of athletics scholarships or grants-in-aid as listed on

the NCAA squad lists and other financial aid, not on the squad lists, such as summer school financial aid, cash awards for academic achievement, provision of loss-of-value insurance for student athletes eligible for professional drafts, loans, athletic department employment, reimbursement for studies abroad, etc. Mr. O'Brien does not take issue with this methodology and agrees with my determination that male athletes were favored. However, he objects to my determination that the inclusion of summer school financial aid is warranted because it was not distributed on a gender-neutral basis.

6. I provide the reasons for my determination about summer school financial aid here.

7. When I submitted my Initial Report, I had received documentation of academic achievement awards that I determined would not count in the computation of "total athletics financial aid" because such aid was awarded to both male and female athletes on a gender-neutral basis ($500 to any male or female athlete meeting the same academic standard).

8. I also received documentation regarding the distribution of summer school financial aid and found that male athletes had been significantly favored in the distribution of such aid. *See* Table 1:

| Table 1. SDSU DISTRIBUTION OF SUMMER FINANCIAL AID - 2018-19 through 2023-24* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | H |
| Year | SUMMER Financial Aid Awarded to Male Athletes | SUMMER Financial Aid Awarded to Female Athletes | Total SUMMER Financial Aid Awarded | Percent SUMMER Financial Aid Awarded to Male Athletes | Percent SUMMER Financial Aid Awarded to Female Athletes | Male Athlete Participation Rate | Female Athlete Participation Rate | Variance from Female Participant Rate |
| 2018-19 | 643,349 | 200,473 | $843,822 | 76.2% | 23.8% | 41.5% | 58.5% | 34.7% |
| 2019-20 | 511,515 | 188,962 | $700,477 | 73.0% | 27.0% | 43.3% | 56.7% | 29.7% |
| 2020-21 | 443,993 | 193,740 | $637,733 | 69.6% | 30.4% | 43.1% | 56.9% | 26.5% |
| 2021-22 | 569,527 | 174,634 | $744,161 | 76.5% | 23.5% | 47.8% | 52.2% | 28.7% |
| 2022-23 | 626,437 | 221,850 | $848,287 | 73.8% | 26.2% | 49.4% | 50.6% | 24.4% |
| 2023-24 | 723,873 | 243,038 | $966,911 | 74.9% | 25.1% | 50.7% | 49.3% | 24.2% |

*Summer financial aid as provided by January 10, 2025 O'Brien Report at Exhibit 2 except 2018-19 from SDSU-FISK-0057320

9. SDSU awards summer financial aid to athletes either to attend academic classes or to remain on campus to participate in team practice and training without enrolling in summer classes with Table 1 showing a comingled total. The total amount spent on such stipends in each and every year examined favored male compared to female athletes. The decisions to award such aid and prioritize aid provided for training purposes over attendance in academic classes was made by the athletic director as stated in the SDSU Student Right to Know Act statement, published on SDSU's athletics website as required under California law.

10. Financial aid for summer school or intercessions is not part of this [grant-in-aid] award. Financial aid for such terms must be requested through the Athletics Department and may be awarded separately upon the recommendation of the head coach and the approval of the Director of Intercollegiate Athletics (or designee).[1]

11. NCAA rules regarding schools conducting summer practices and providing financial aid to students are permissive. Mr. O'Brien's reference to "required" means that SDSU's athletic administration decided to allow the coaches of select teams to require their students to be on campus for athletic participation activities. Further, even if NCAA rules did require such participation, governing association rules do not obviate the institution's gender equity obligation.[2] Aid in summer activities decided by the athletic director is not a gender-neutral policy if gender-neutral criteria are not specified or if the athletic director's decisions do not produce a gender-neutral result.

---

[1] San Diego State Aztecs, *Student-Athletes Right to Know Act (AB 2079)*, https://goaztecs.com/student-athletes-right-to-know-act-ab-2079 (last visited Feb. 19, 2025).

[2] "*Effect of rules or regulations of private organizations.* The obligation to comply with this part is not obviated or alleviated by any rule or regulation of any organization, club, athletic or other league, or association which would render any applicant or student ineligible to participate or limit the eligibility or participation of any applicant or student, on the basis of sex, in any education program or activity operated by a recipient and which receives Federal financial assistance." 34 C.F.R. § 106.6(c).

12. Mr. O'Brien also opines that there are other policies not published in the SDSU Student Right To Know Act statement that demonstrate gender neutrality in the provision of summer financial aid, all of which should have been part of this statement.

13. While the factors mentioned are gender-neutral on their face, they are not applied in a gender-neutral manner.

14. For example, an analysis of the summer athletics financial aid awarded demonstrates that the primary intent of summer financial aid is not academic, as indicated in Table 2.

| Table 2- Academic Summer Aid as a Percent of Total Summer Aid - 2019-20 to 2023-24* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | SUMMER Financial Aid Awarded to Male Athletes | AMOUNT for Academic Course Attendance Male Athletes | PERCENT for Academic Course Attendance Male Athletes | SUMMER Financial Aid Awarded to Female Athletes | AMOUNT for Academic Course Attendance Female Athletes | PERCENT for Academic Course Attendance Female Athletes | Total SUMMER Financial Aid Awarded | All Athletes Percent for Academic Course Attendance |
| 2019-20 | 511,515 | 22,260 | 4% | 188,962 | 47,266 | 25% | $700,477 | 10% |
| 2020-21 | 443,993 | 16,585 | 4% | 193,740 | 78,064 | 40% | $637,733 | 15% |
| 2021-22 | 569,527 | 3,421 | 1% | 174,634 | 69,750 | 40% | $744,161 | 10% |
| 2022-23 | 626,437 | 3,986 | 1% | 221,850 | 133,199 | 60% | $848,287 | 16% |
| 2023-24 | 723,873 | 20,511 | 3% | 243,038 | 102,844 | 42% | $966,911 | 13% |

*Source: January 10 O'Brien Report -Amount of academic aid at p. 13 and total aid at Exhibit 2

15. Further, testimony of female coaches and athletes indicate that athletes were aware that, outside of the training priority established for football, men's and women' basketball, and volleyball for summer aid, SDSU would only summer award aid to student-athletes for two reasons: (1) to increase GPA if the student was facing ineligibility; or (2) because the student needed to take a course in the summer in order to be able to graduate the next spring. Burrell Dep. at 123. Thus, other coaches did not ask for summer aid for student-athletes who were taking summer classes outside of those specific reasons. *Id.* at 123-127.

16. I also do not agree with Mr. O'Brien' opinion that the size of the team is a gender-neutral criteria for sex separate teams as Mr. O'Brien inaccurately suggests.

17. The athletic director's decision to select football (range of 106-119 participants in any given year) and men's basketball (16-19 participants) for favored treatment compared to women's basketball (14-15 participants) and volleyball (16-27 participants) was a decision to treat a significantly larger proportion of men better than women. Gender equity is determined by the proportion of participants and not the proportion of teams for exactly this reason. Finally, I reiterate that no NCAA rule requires an institution to support summer practice for any team. For this reason, Mr. O'Brien's suggestion that training aid should be discounted should be rejected.

### IV. CONSIDERATION OF NON-DISCRIMINATORY FACTORS THAT WOULD EXPLAIN DISPARITIES IN ATHLETICS AID

18. Mr. O'Brien correctly stated that I was unaware of any other non-discriminatory factors that would explain any disparity in the award of athletics-related financial assistance:

> I would note that in Dr. Lopiano's report she indicated that she was unaware of any nondiscriminatory factors that would explain any disparity in the award of athletics related financial assistance. (Plaintiffs' Expert Report, p. 30, n.9). Given the neutral nature of the University's policy in this regard, if Dr. Lopiano had considered the policy and summer aid award factors, it likely would have significantly altered her findings and overall conclusions on the award of athletics related financial aid.

O'Brien Rep. at 14.

19. I have been provided with summer school and Alston academic awards data to date, and have determined that no discriminatory differences existed in the Alston academic awards and the opposite for summer financial aid. Further, I did not address other typical non-discriminatory factors, such as differences between in-state versus out-of-state tuition, because they did not appear to explain the disparate amounts of athletic financial aid given to male and female student-athletes. For example, for 2019-20, I noticed that female scholarship recipients were more likely to be out-of-state residents than male participants, which could have been used to justify the award of

athletics financial aid <u>higher</u> than their proportional athlete representation. Because the proportion of aid to females was <u>lower</u> than their percent of athletics participants. I saw no reason to mention this factor.

## V.     CALCULATION OF MONETARY VALUE OF DAMAGES

20.     In all of the tables that follow in this section, I have adjusted total male and female financial aid amounts to correspond to data made available since preparing my Initial Report. Each table notes the sources used in my revision.

21.     Mr. O'Brien has a fundamental misunderstanding of my opinion regarding the damages that should be paid to those female athletes who did not receive all of the financial aid they could have to compensate them for being denied the opportunity to receive athletic financial aid substantially proportionate to their participation rates. That is the question upon which I was asked to opine.

22.     Mr. O'Brien argues that my opinion regarding damages should be based on what the Office for Civil Rights (OCR) would have done as an administrative remedy in response to a Title IX complaint to a federal agency.

> Quite to the contrary, the traditional approach used by OCR for a past imbalance in the award of athletics related financial aid is not the award of money, but rather, a directive to the university to correct the issue going forward, even if it means to do so during the current academic year.

O'Brien Rep. at 14-15.

23.     I am not opining there should be, as Mr. O'Brien puts it, "an award of current scholarship money to correct past imbalances." O'Brien Rep. at 15. I am opining that "damages" can be calculated and awarded to female student-athletes in the Class for the school's discrimination against them if it is found the school's actions violate Title IX's requirements for athletics financial aid. In this case, it is my understanding that the plaintiffs have chosen to use their individual right

to sue as a method of seeking justice that includes seeking "damages," which I understand to be distinct from relief through OCR.

24.  Mr. O'Brien wants the Court to respond as if it were a federal agency. But OCR has never found a college or university out of compliance with Title IX. OCR's method of remedy is working cooperatively with the institution to address any gender inequities going forward. Instead of finding an institution out of compliance with Title IX, OCR enters into a joint resolution agreement which finds the institution in compliance pending the institution remedying the deficiency by a time certain in the future for future students. This is acknowledged in Mr. O'Brien's Report:

> [T]he traditional approach used by OCR for a past imbalance in the award of athletics related financial aid is not the award of money, but rather a directive to the university to correct the issue going forward, even if it means to do so during the current academic year.

O'Brien Rep. at 14-15.

25.  Under these circumstances, students harmed by past gender inequities have no recourse other than to go to court.

26.  Mr. O'Brien's modification of my methodology would limit the Class to the amount they were shortchanged. My methodology, however, calculates damages by determining how to treat female athletes as well as male athletes were treated. My methodology clearly differs from Mr. O'Brien's. I believe that the methodology I propose more accurately calculates damages owed to the Class. **Critically, both Mr. O'Brien's methodology and my methodology indicate that liability and damages can be calculated on a classwide basis.**

27.  Mr. O'Brien also suggests that my "approach is completely inconsistent with the way that scholarships are awarded, which are based on highly individualized aid awards to specific student-athletes." O'Brien Rep. at 15. This statement is misleading. Gender equity under Title IX

is not determined on the basis of athlete-to-athlete or team-to-team comparison. Gender equity is determined in the aggregate – total money awarded to all male athletes compared to total dollars to all female athletes and the equity standard of proportional to athletic participation. In the case of calculating damages to the Class, it is unnecessary to determine what individual athletes would have received if more dollars were available when they played and how the funds would have been distributed as athletic scholarships.

28. Further, Mr. O'Brien spends multiple pages, O'Brien Rep. at 18-20, explaining his perception of practical issues in the back award of athletics scholarships, criticizing the fact that I have not addressed NCAA rules, such as members of the class receiving awards that exceed the cost of attendance, or developed a distribution plan that would meet NCAA scholarship rules. I was not asked to opine on a distribution plan and do not believe that damages would be subject to any of these considerations. If damages are awarded by the court, they are not athletic scholarships and they are not subject to NCAA rules regarding athletic scholarships. The NCAA has no rules governing receipt of court determined compensation for victims of sex discrimination.

29. Mr. O'Brien also suggests that my methodology is deficient because I did not consider the one percent variance in the difference between males and females in my calculation of damages. (I did, however, consider it in determining whether women were denied the opportunity to receive substantially proportionate athletic financial aid.) *See* Initial Report ¶ 35. First, it is important to understand the concept of a gender equity "safe harbor." The one percent variance merely indicates a presumption that the allocation of athletic financial aid to male and female student-athletes is or is not substantially proportionate. If a school had a variance of 0.9% but the entire source of that variance was because the institution decided men were more deserving of athletic scholarships than women, then the school could be found to have discriminated against the

women. When determining retrospective damages for violations of Title IX, the one percent variance inconsequential consideration and certainly cannot be used as a "safe harbor." If a school is asked what should female or male athletes have received, the one percent variance has no functionality. The school would not say $120,000 more or less one percent. The answer is whatever the male or female athlete percentages were. The one percent variance is only used by OCR to determine whether the school should be given a presumption of gender equity. If the male athletes received 50 percent of all financial aid and their percent participation was 55 percent – a five percent variance – male athletes were shortchanged five percent and not one percent on either side of five percent.

30.    I will go through the three steps of my methodology required to make the safe harbor variance decision using my most recent total financial aid information to determine whether SDSU distributed athletic financial aid to its male and female student-athletes in amounts substantially proportional to their athletic participation rates, I first identified the number and percentages of male and female participants in each year. Table 3 summarizes the annual total participant counts and percentages they represent according to my participant counting methodology. Table 3 shows that result.

Table 3. Computation of Percent SDSU Male and Female Athletes Using Unduplicated Title IX Participant Counts: 2018-19 through 2023-24

| Year | Male Athletes | Female Athletes | Total Athletes | Male Athlete Participation Rate | Female Athlete Participation Rate |
|---|---|---|---|---|---|
| 2018-19 | 211 | 297 | 508 | 41.5% | 58.5% |
| 2019-20 | 232 | 304 | 536 | 43.3% | 56.7% |
| 2020-21 | 217 | 286 | 503 | 43.1% | 56.9% |
| 2021-22 | 219 | 239 | 458 | 47.8% | 52.2% |
| 2022-23 | 214 | 219 | 433 | 49.4% | 50.6% |
| 2023-24 | 216 | 210 | 426 | 50.7% | 49.3% |

31. Table 4 below summarizes the total financial aid to male and female student-athletes and the percentage by sex, which I computed according to my counting methodology.

Table 4. Computation of Percent of Total Financial Aid Awarded to Male and Female Athletes Using Unduplicated Participant Counts and Total Financial Aid Awarded
2018-19 Through 2023-24

| Year | Financial Aid Awarded to Male Athletes | Financial Aid Awarded to Female Athletes | Total Financial Aid Awarded | Percent Financial Aid Awarded to Male Athletes | Percent Financial Aid Awarded to Female Athletes |
|---|---|---|---|---|---|
| 2018-19 | 4,604,510 | 4,573,653 | $9,178,163 | 50.2% | 49.8% |
| 2019-20 | 4,546,919 | 4,651,921 | $9,198,840 | 49.4% | 50.6% |
| 2020-21 | 4,259,850 | 4,399,467 | $8,659,317 | 49.2% | 50.8% |
| 2021-22 | 4,835,597 | 4,609,739 | $9,445,336 | 51.2% | 48.8% |
| 2022-23 | 4,759,536 | 4,555,743 | $9,315,279 | 51.1% | 48.9% |
| 2023-24 | 5,314,830 | 4,733,216 | $10,048,046 | 52.9% | 47.1% |

*Financial aid derived from January 10, 2025 O'Brien Report at Exhibit 2 except 2018-19 from SDSU-FISK-0057320

32. Once the percentage of male and female students who participated in intercollegiate varsity athletics at SDSU (Table 3) and the total amount of financial aid awarded to male and female student-athletes at SDSU (Table 4) is known, it is a straightforward matter to determine whether female student-athletes received financial aid proportional to their participation rates. Table 5 below provides the calculations based on this data, followed by the detailed explanation of the calculations.

Table 5. Computation of Whether SDSU Female Athletes were Awarded Financial Aid Proportional to Their Participation Rates – 2018-19 Through 2023-24

| Year | A<br>Financial Aid Awarded to Male Athletes | B<br>Financial Aid Awarded to Female Athletes | C<br>Total Financial Aid Awarded | D<br>Percent Financial Aid Awarded to Male Athletes | E<br>Percent Financial Aid Awarded to Female Athletes | F<br>Male Athlete Participation Rate | G<br>Female Athlete Participation Rate | H<br>Variance from Female Participant Rate |
|---|---|---|---|---|---|---|---|---|
| 2018-19 | 4,604,510 | 4,573,653 | $9,178,163 | 50.2% | 49.8% | 41.5% | 58.5% | 8.6% |
| 2019-20 | 4,546,919 | 4,651,921 | $9,198,840 | 49.4% | 50.6% | 43.3% | 56.7% | 6.1% |
| 2020-21 | 4,259,850 | 4,399,467 | $8,659,317 | 49.2% | 50.8% | 43.1% | 56.9% | 6.1% |
| 2021-22 | 4,835,597 | 4,609,739 | $9,445,336 | 51.2% | 48.8% | 47.8% | 52.2% | 3.4% |
| 2022-23 | 4,759,536 | 4,555,743 | $9,315,279 | 51.1% | 48.9% | 49.4% | 50.6% | 1.7% |
| 2023-24 | 5,314,830 | 4,733,216 | $10,048,046 | 52.9% | 47.1% | 50.7% | 49.3% | 2.2% |

Financial aid derived from January 10, 2025 O'Brien Report at Exhibit 2 except 2018-19 from SDSU-FISK-0057320

33. Columns A and B list the total amount of financial aid awarded to male and female student-athletes, respectively, and Column C reflects the sum of those figures. Columns D and E show the percent of financial aid awarded to male and female student-athletes, respectively. Each of these figures were listed in Table 4. Columns F and G list the Male and Female Athlete Participation Rates, as listed in Table 3. Column H shows the difference between Column E and Column G: the variance between the percentage of financial aid provided to the female student-athletes and their participation rates. This Column H percent is examined to determine whether it is within the one percent safe harbor variance. SDSU was not within the one percent safe harbor variance in any of the years at question in this case.

34. If Class members were denied the opportunity to receive athletic financial aid substantially proportionate to their participation rates, it is also possible to calculate, on a class wide basis, the amount class members should be paid for being denied that opportunity. One can easily determine, for each year, (1) the total amount the school would have needed to pay to make the financial aid it awarded to male student-athletes substantially proportionate to their participation rates, (2) the portion of that total amount the school would have needed to pay female student-athletes to make the amount they received proportionate to their participation rates, and (3) the

difference between that amount and the amount of financial aid actually awarded to the female student-athletes. Calculating that difference is one straightforward way to determine the accurate compensation amount. Paying that amount (plus interest) to the female student-athletes would make the amounts paid to both the female student-athletes and the male student-athletes proportional to their participation rates. It would put the female student-athletes in the same financial position as male student-athletes, had the school not discriminated against them.

35. It is critical to understand that the athletic participation rates of male and female student-athletes are inextricably intertwined because, together, they must equal 100%. One cannot go up without the other going down an equal amount. The same is true of the percentages of athletic financial aid awarded to male and female student-athletes. So, when a school gives female student-athletes an amount of financial aid that is less than their proportional share, it is simultaneously giving male student-athletes the same amount more than their proportional share. The school thus mathematically underpays female student-athletes and overpays male student-athletes. As a result, unless the school is going to claw back from male student-athletes the disproportionate financial aid it gave them—which I understand the Plaintiffs are not seeking nor is this practically feasible—the only way it can adequately compensate female student-athletes is to pay them the amount it discriminatorily failed to award them while keeping the amount discriminatorily awarded to make student-athletes constant. Calculating the amount female student-athletes need to be paid to make the amount they receive proportional to their participation rate—given what the men received—does this.

36. These amounts – and their totals – can be calculated on a class-wide basis, from four variables:(1) the number of male students who participated in intercollegiate varsity athletics at SDSU; (2) the number of female students who participated in intercollegiate varsity athletics at

SDSU; (3) the total amount of financial aid awarded to male student-athletes; and (4) the total amount of financial aid awarded to female student-athletes. Table 6 below depicts this calculation and is followed by a detailed explanation of its methodology:

Table 6.
Computation of Amounts Required to Compensate Female Athletes for Being Denied Opportunity to Receive Athletic Financial Aid Substantially Proportionate to Participation Rates

|  | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| Year | Financial Aid Awarded to Male Athletes | Male Athlete Participation Rate | Total Aid Amount Needed to Make Financial Aid to Male Athletes Proportional | Female Athlete Participation Rate | Portion of Total Amount Needed to Make Financial Aid to Female Athletes Proportional | Financial Aid Awarded to Female Athletes | Compensation Amount (without interest) |
| 2018-19 | 4,604,510 | 41.5% | $11,095,205 | 58.5% | $6,486,763 | 4,573,653 | $1,913,110 |
| 2019-20 | 4,546,919 | 43.3% | $10,956,431 | 56.7% | $6,214,095 | 4,651,921 | $1,562,174 |
| 2020-21 | 4,259,850 | 43.1% | $10,264,699 | 56.9% | $5,836,389 | 4,399,467 | $1,436,922 |
| 2021-22 | 4,835,597 | 47.8% | $11,652,041 | 52.2% | $6,080,432 | 4,609,739 | $1,470,693 |
| 2022-23 | 4,759,536 | 49.4% | $11,468,761 | 50.6% | $5,800,598 | 4,555,743 | $1,244,855 |
| 2023-24 | 5,314,830 | 50.7% | $12,806,819 | 49.3% | $6,313,221 | 4,733,216 | $1,580,005 |
|  |  |  |  |  |  | TOTAL | $9,207,759 |

SDSU-FISK-0057320 and SDSU-FISK-0057315 through SDSU-FISK-0057319

37. Columns A and F list the total amount of financial aid awarded to male and female student-athletes, respectively. These figures were calculated and listed in Table 4. Columns B and D list the Male and Female Athlete Participation Rates, calculated and listed in Table 3.

38. To determine the total amount of aid needed to make the amount of financial aid awarded to male student-athletes proportionate to their participation rate (Col. C), I divided the Financial Aid Awarded to Male Athletes (Col. A) by the Male Athlete Participation Rate (Col. B).

39. To calculate the portion of the total amount needed to make the financial aid to female student-athletes proportional to their participation rate (Col. E), I multiplied the Total Aid Amount Needed to Make Financial Aid to Male Athletes Proportional (Col. C) by the Female Participation Rate (Col. D). To determine the compensation amount (without interest) the female

student-athletes should be paid (Col. G), I subtracted the amount of Financial Aid Awarded to Female Athletes (Col. F) from the Amount Needed to Make Financial Aid to Female Athletes Proportional (Col. E). That amount, plus interest, is the amount the female student-athletes should be paid to compensate them for being denied the opportunity to receive athletic financial aid substantially proportional to their participation rates.

## VI.    THE CLASS REPRESENTATIVES

40.     I have been asked to verify that the proposed Class representatives – Madison Fisk, Carina Clark, Natalie Figueroa, Kaitlin Heri, Olivia Petrine, and Kamryn Whitworth – participated in intercollegiate varsity athletics at San Diego State University during the period 2018-2019 through the 2023-24 academic years and did not receive all of the athletic financial aid they could have received. I reviewed the 2018-19 through 2023-24 SDSU NCAA Squad lists and verified that the proposed class representatives were recorded as eligible participants on the official squad lists. I also reviewed the disbursement of athletic financial aid through the official squad lists and the grant in aid data to these individuals and verified that the proposed class representatives did not receive all of the athletic financial aid they could have received during the 2018-19 through 2023-24 academic years.

Respectfully submitted,

Donna A. Lopiano, Ph.D.

Date: February 19, 2025